[Crim. No. 1436.   Fourth Dist.   Feb. 4, 1960.]

THE PEOPLE, Respondent, v. BARNEY A. DENNIS, Appellant.

656

William E. Jensen, under appointment by the District Court of Appeal, and Casper & Jensen for Appellant.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

GRIFFIN, P. J.—Prior to his first trial in 1954, defendant entered the sole plea of not guilty by reason of insanity to an information charging him with two counts of assault with intent to commit murder (Pen. Code, § 217) and four counts of assault with a deadly weapon (Pen. Code, § 245). After trial before the court, sitting without a jury, he was found sane at the time of the alleged offenses and sentenced to state prison. An appeal from this conviction was taken to this court but the appeal was dismissed at the request of defendant's attorney. In September, 1955, the Supreme Court denied a petition for habeas corpus filed by the defendant in propria persona. A subsequent petition for habeas corpus was filed with the Supreme Court by an attorney acting on defendant's behalf. The Supreme Court determined that where uncontradicted evidence established that the defendant was insane at the time of trial, the conviction should be reversed. On March 21, 1959, the Supreme Court by its judgment ordered that the defendant be returned to the trial court, that the trial court determine defendant's present san-

ity and if he be found presently sane that there be a retrial of the issue of his sanity at the time of the commission of the offenses committed in April, 1954. (*In re Dennis,* 51 Cal.2d 666, 668 [335 P.2d 657].)

On June 9, 1959, the issue of defendant's present sanity was tried by the court, sitting without a jury. A qualified psychiatrist testified that in his opinion the defendant was mentally able to appreciate the nature of the proceedings being held and to cooperate in his own defense. The defense conceded that the defendant was able to cooperate with his attorney and was fully cognizant of the nature of the proceedings. The court rendered judgment that the defendant was presently sane within the meaning of sections 1367 and 1368 of the Penal Code.

The issue of defendant's sanity at the time of the commission of the offenses was tried by a jury, which returned a verdict finding him sane. Defendant appeals from the judgment of conviction. The only contention by defendant on the appeal is that the evidence is insufficient to support the verdict of the jury.

The evidence disclosed that defendant was separated from his wife some time in the month of March, 1954, and that he had threatened to kill her. On the afternoon of April 28, 1954, Mrs. Dennis was at her home in San Diego, when she observed defendant at the kitchen door. At the time he was carrying a shotgun which was concealed in a cloth wrapping. She ran outside. He pursued her, fired a shot over her head, caught her and dragged her back into the house. The defendant told his wife that there was going to be a gun battle and that the pantry would be the safest place for her to hide. Shortly thereafter, he fired out a window and wounded a uniformed deputy marshal who was approaching the house from the front. As the marshal was being helped to a safe place by a police officer who resided nearby, the defendant shot at both men from a different position in the house. Other officers surrounded the Dennis home and the defendant fired at them from various positions within the house, wounding three more officers. As the officers returned his fire, he lay on the floor in the same position of safety that he had previously pointed out to his wife. His wife then asked defendant to surrender and he said he couldn't because he had already shot a policeman. During the gun battle, defendant ordered his wife to go to the telephone and answer calls, and then defendant told his wife to call the police and tell them that he was ready

to give himself up. As she was doing this, a tear gas shell exploded within the house and defendant's wife fled through the front door. He fired at her as she left the house, wounding her severely in the leg. Then he emerged from the kitchen door with his hands up. As he got to the bottom of the steps he dropped his hands and an officer ordered him to raise them again, which he did. While he was being handcuffed, searched and transported to the county hospital for treatment of a wound received during the gun battle, defendant was cooperative and not abusive or combative. Defendant told the officers with him that he was the only one in the house with a shotgun and said he had seen a man in a green uniform approaching the house and that there was a restraining order out against defendant and that he had shot the officers so they would not take him. The following day at the hospital the defendant told an officer guarding him that he had bought the gun about a week before and had taken it to the wife's home to frighten her. He asked the officer for permission to read the newspaper and stated that he wanted to see if he had "hit the newspapers." He further questioned the officer as to what the maximum and minimum penalties for his offense were and when arraigned on four counts stated that he thought he had shot only two persons, his wife and a police officer.

Considerable evidence was introduced at the trial concerning defendant's mental condition. He had been discharged from the Military Service in 1944 with a mental illness diagnosed as schizophrenic reaction, paranoid type. In 1947 he was confined in the Patton State Hospital for a short period of time and later transferred to the Veterans Hospital in Los Angeles. Dr. McMillan examined defendant in 1950 and 1951 for purposes of veteran's disability determination. He concurred in the earlier diagnosis of defendant's illness and in December, 1951, described it as chronic, mild and improved. It was established that defendant had been steadily employed at Convair in San Diego for about three years preceding April, 1954. His wife, to whom he had been married for about five and a half years in 1954, testified that defendant acted just as he always did when he was angry except that he was a little desperate. His father-in-law had known defendant about 10 years in 1954, and testified that in his opinion defendant was normal. Dr. Larson, a psychiatrist employed as status psychiatrist at San Quentin Prison, testified that he examined the defendant in October of 1958 and that although the defendant had been chronically mentally ill for many

years, he believed that the defendant had been able to distinguish between right and wrong on the day of the shooting despite his mental condition.

The defense called several psychiatrists who testified as to defendant's mental condition. Dr. Sult examined the defendant on the day following the shooting and formed the opinion that defendant was suffering from schizophrenia, paranoid type, and that in his opinion the defendant did not know right from wrong and that his condition was incurable. On cross-examination, Dr. Sult admitted that a person could have this mental disorder and still distinguish right from wrong and that such a person might have periods of remission when his mental illness would be less severe. Dr. Crowley, a psychiatrist of the staff of Patton State Hospital, examined the defendant two months after the shooting, in June, 1954. He diagnosed defendant's mental state as schizophrenic condition, paranoid type, which he considered an incurable mental illness. It was Dr. Crowley's opinion that defendant was partially unable to distinguish the nature and quality of his acts and unable to distinguish right from wrong at the time of the shooting. On cross-examination, Dr. Crowley said that he was not absolutely certain of his opinion because he was not at the scene at the time of the shooting and he admitted that the defendant might be able to distinguish right from wrong a great deal of the time. In response to a hypothetical question setting forth the circumstances of the gun battle on April 28, 1954, and defendant's actions at that time, Dr. Crowley stated that without more information he would conclude that the hypothetical person so described was sane. It was brought out that the defendant refused to permit Dr. Crowley to reexamine him prior to the retrial in 1959. Dr. Peterson testified that he examined defendant two months after the shooting and had formed the opinion that defendant understood the nature and quality of his actions at the time of the offenses but was unable to distinguish right from wrong. However, Dr. Peterson admitted that this was only a fair assumption and that it was possible that defendant knew the difference between right and wrong during the shooting episode.

Dr. Lengyel, testifying for the prosecution, said that he examined defendant shortly after the shooting incident in 1954, and at that time he had come to the conclusion that defendant was insane and unable to understand the nature and quality of his acts and to know the difference between

right and wrong at the time of the commission of the offenses charged against him. However, Dr. Lengyel added that he had observed defendant prior to the retrial in 1959 and defendant's condition at that time was so markedly improved that he questioned the validity of the earlier opinion.

The contention that the evidence is insufficient to support the verdict cannot be sustained. One psychiatrist and two intimate acquaintances of the defendant testified that in their opinions defendant was sane at the time he committed the offenses charged. Where there is evidence tending to show insanity and also evidence tending to show that the defendant was sane, it is for the jury to decide whether or not at the time of the commission of the offenses the defendant was sane, and the finding of the jury on conflicting evidence will not be disturbed on appeal. (*People* v. *Carskaddon,* 123 Cal.App. 177 [11 P.2d 38]; *People* v. *Benton,* 144 Cal.App.2d 600 [301 P.2d 620]; *People* v. *Loomis,* 170 Cal. 347, 349 [149 P. 581]; *People* v. *Niino,* 183 Cal. 126, 128 [190 P. 626].)

". . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].)

Although the expert medical testimony was unanimous that defendant was suffering from a mental illness diagnosed as schizophrenic reaction, paranoid type, at the time of the commission of those offenses, this would not compel the conclusion that he was legally insane at the time he committed them. (*People* v. *Willard,* 150 Cal. 543 [89 P. 124].)

In *People* v. *Field,* 108 Cal.App.2d 496 [238 P.2d 1052], the rule was stated as follows:

". . . there are many kinds and degrees of insanity, and it is not every kind or degree which will relieve a person from criminal responsibility, and the degree of mental impairment which would authorize his confinement in an asylum for the insane may be entirely different from the degree of mental derangement which will relieve him from responsibility for his criminal acts."

It is well settled that evidence as to a defendant's acts, conduct, declarations and appearance, both before and after the time in question as well as at the particular time as to which the issue of defendant's sanity has been raised may be admitted to aid the trier of fact in determining the issue

presented by a plea of insanity. (*People* v. *Willard, supra*; *People* v. *David*, 12 Cal.2d 639 [86 P.2d 811]; *People* v. *Zeigler*, 142 Cal. 337 [75 P. 1090].) ▮ Since the testimony of intimate acquaintances of the defendant and Dr. Larson and the evidence of defendant's acts and conduct at the time of the commission of the offenses charged support the verdict of the jury, it cannot be said that the verdict is unsupported by substantial evidence in the record. The trial court fully and fairly instructed the jury on the law of insanity as it applied to the evidence in the case and the jury by its verdict determined that appellant was sane. The evidence of the prosecution, if believed by the jury, supports their verdict, and we cannot disturb their conclusion. (*People* v. *Loomis, supra.*)

In defendant's reply brief a motion was made to correct two errors in the reporter's transcript of the trial wherein the word "insane" was erroneously recorded as "sane". The attorney general has stipulated that the errors were made and that the motion may be granted. After a consideration of the corrected record, our ultimate conclusions are the same.

Motion to correct record granted. Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.