[Crim. No. 7434. In Bank. Aug. 31, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD DENNIS WOLFF, Defendant and Appellant.

James O. Warner for Defendant and Appellant.

Kenny, Morris & Ibanez and Richard A. Ibanez as Amici Curiae on behalf of Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals from a judgment imposing a sentence of life imprisonment (with recommendation that he be placed in a hospital for the criminally insane) after he pleaded not guilty by reason of insanity to a charge of murder, the jury found that he was legally sane at the time of the commission of the offense, and the court determined the killing to be murder in the first degree.

Defendant contends that the evidence is insufficient to support the verdict of sanity, that the court gave conflicting

instructions on the presumptions of sanity and of the continuance of prior "permanent" insanity, and that his crime should have been determined to be second degree rather than first degree murder. Upon a comprehensive view of all the evidence we have concluded that the first two of these contentions are without merit, but that the judgment should be reduced to murder of the second degree.

Defendant, a 15-year-old boy at the time of the crime, was charged with the murder of his mother. The juvenile court found him to be "not a fit subject for consideration" under the Juvenile Court Law, and remanded him to the superior court for further proceedings in the criminal action. To the information accusing him of murder defendant entered the single plea of "not guilty by reason of insanity," thereby admitting commission of the basic act which, if not qualified under the special plea, constitutes the offense charged. (Pen. Code, § 1016.) After considering reports of three alienists appointed to examine defendant (Pen. Code, § 1027) the court declared a doubt as to his mental capacity to stand trial (§§ 1368 et seq.). At a hearing on that issue, however, the court found defendant to be "mentally ill but not to the degree that would preclude him from cooperation with his counsel in the preparation and presentation of his defense." The plea of not guilty by reason of insanity was then tried to a jury and resulted in a verdict that defendant was legally sane at the time of the commission of the jurisdictional act of killing. Defendant's motion for new trial on the ground of insufficiency of the evidence was heard and denied, and by stipulation the question of the degree of the crime was submitted to the court on the basis of the evidence introduced at the trial and the report of the probation officer. The court determined the crime to be murder in the first degree; sentenced defendant to life imprisonment; and to the judgment added, "Placement in hospital for criminally insane recommended."

### The California M'Naughton Rule

On the issue of insanity the jury were instructed in terms of the California rule; i.e., the so-called M'Naughton rule as that rule has been developed by statute and decision in California. In hereinafter discussing and ruling upon the sufficiency of the evidence to support the finding (a) that defendant was legally sane and (b) that the murder was of the first degree, the liberality of the California rule, and the sometimes dual materiality (where the crime is divided into

degrees) of evidence admitted thereunder, will become apparent.

The original M'Naughton language from which the California rule has been evolved is set out in the margin.[1] Under that language a mentally ill defendant could be found sane even though his "knowledge" of the nature or wrongfulness of his act was merely a capacity to verbalize the "right" (i.e., socially expected) answers to questions put to him relating to that act, without such "knowledge" having any affective meaning for him as a principle of conduct. Such a narrow, literal reading of the M'Naughton formula has been repeatedly and justly condemned. (2 Stephen, History of the Criminal Law of England (1883) pp. 170-171; Weihofen, Mental Disorder as a Criminal Defense (1954) pp. 76-77; Hall, General Principles of Criminal Law (2d ed. 1960) pp. 481, 494, 520; Diamond, *Criminal Responsibility of the Mentally Ill* (1961) 14 Stan.L.Rev. 59, 62; Glueck, Law and Psychiatry (1962) p. 49, fn. 14.) Rather, it is urged by many that the word "know" as used in the formula be given "a wider definition so that it means the kind of knowing that is relevant, i.e., realization or appreciation of the wrongness of seriously harming a human being" (Hall, *op. cit. supra,* at p. 520). "If the word 'know' were given this broader interpretation, so as to require knowledge 'fused with affect' and assimilated by the whole personality—so that, for example, the killer was capable of identifying with his prospective victim—much of the criticism of the knowledge test would be met." (Weihofen, *op. cit. supra,* at p. 77.)

The California courts have not been unresponsive to such proposals for liberalization of the original language of the M'Naughton rule (*ante,* fn. 1); in evolving our own rule to meet statutory requirements, apply humane concepts, and at the same time protect society, we have reformulated the test with a variety of specifications to achieve this end. (See e.g., *People* v. *Willard* (1907) 150 Cal. 543, 554 [83 P. 124] ["if he *understands* the nature and character of his action and its consequences"]; *People* v. *Harris* (1914) 169 Cal. 53,

---

[1] "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*Queen* v. *M'Naughton* (1843) 4 St.Tr. (N.S.) 847, 931; *M'Naughton's Case* (1843) 10 Clark & F. 200, 210, 8 Eng. Reprint 718, 722; see *People* v. *Coffman* (1864) 24 Cal. 230, 235.)

61 [145 P. 520] ["having mental capacity to know *and understand* the nature and character of the act he was committing"]; *People* v. *Oxnam* (1915) 170 Cal. 211, 213 [149 P. 165] ["If appellant . . . had sufficient mental capacity to *appreciate* the character and quality of his act, knew *and understood* that it was a violation of the rights of another . . . , if he had the capacity thus to *appreciate* the character and comprehend the possible or probable consequence of his act"]; *People* v. *Morisawa* (1919) 180 Cal. 148, 150 [179 P. 888] ["if the defendant . . . did not *appreciate* the act he was committing"]; *People* v. *Gilberg* (1925) 197 Cal. 306, 314 [3] [240 P. 1000] ["he *appreciated* the nature and the quality of the act"]; *People* v. *Wells* (1949) 33 Cal.2d 330, 351 [20] [202 P.2d 53] ["to know the nature of his act *and appreciate* that it was wrongful and could subject him to punishment"]; *People* v. *Gorshen* (1959) 51 Cal. 2d 716, 735 [18] [336 P.2d 492] [relative to identity or degree of a crime].) (Italics added.) Guided by such decisions, our trial courts place a commendably broad interpretation upon the M'Naughton "knowledge" test: in the case at bench, for example, the jury were given the now standard instruction (CALJIC No. 801 Rev.) that "Insanity, as the word is used in these instructions, means a diseased and deranged condition of mind which renders a person incapable of knowing *or understanding* the nature and quality of his act, *or* to distinguish right from wrong in relation to that act.

"The test of sanity is this: First, did the defendant have sufficient mental capacity to know *and understand* what he was doing, and second, did he know *and understand* that it was wrong *and a violation of the rights of another?* To be sane and thus responsible to the law for the act committed, the defendant must be able to know *and understand* the nature and quality of his act *and* to distinguish between right and wrong at the time of the commission of the offense." (Italics added.)[2] Reviewing similar instructions, the Special Commission on Problems of Insanity Relating to Criminal Offenders concludes that "In any event, regardless of how the *M'Naghten*[3] [*sic*] test is applied elsewhere, the California courts have attempted to give a psychologically sound recog-

[2]The jury were also instructed (CALJIC No. 806) that "irresistible impulse" is not a defense "If a person is conscious of, knows *and appreciates* the nature and wrongfulness of his act." (Italics added.)

[3]From the report of *The Queen Against Daniel M'Naughton* (1843) 4 St.Tr. (N.S.) 847, we accept the preferred spelling as "M'Naughton."

nition to the depth and insight required of a defendant's knowledge.'' (First Report, Special Commissions on Insanity and Criminal Offenders (1962) p. 23, fn. 6.)

■ Nevertheless, amicus curiae contends that the California rule is unconstitutional in that it assertedly deprived defendant of due process and equal protection of the law. Similar arguments as to the M'Naughton rule were rejected by the United States Supreme Court in *Leland* v. *Oregon* (1952) 343 U.S. 790, 800-801 [72 S.Ct. 1002, 96 L.Ed. 1302]. Quoting the high court (*ibid.*) to the effect that ''The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's* [*sic*] *Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law [fns. omitted],'' amicus curiae urges that now, 12 years after *Leland,* scientific knowledge has reached that point. But the extent and nature of advances in psychiatric knowledge during the past decade are not shown, and we are not persuaded that they have been of such a revolutionary scope as to undermine the holding in *Leland.*[4]

Moreover, as the United States Supreme Court further observed in *Leland* (at p. 801 of 343 U.S.), ''choice of a test of

[4]The brief of amicus curiae, a society for the advancement of forensic psychiatry, tends to leave the reader with the impression that psychiatric diagnoses are as reliable and predictable as those of the classic branches of medicine, and that the general unanimity of the psychiatrists in the case at bench is the rule rather than the exception. For a documented discussion that dispels this impression and reveals the other side of the psychiatric coin, see Hakeem, *A Critique of the Psychiatric Approach to Crime and Correction* (1958) 23 Law & Contemp. Prob. 650; see also Szasz, *Psychiatry, Ethics, and the Criminal Law* (1958) 58 Colum. L. Rev. 183; Hall, *Psychiatry and Criminal Responsibility* (1956) 65 Yale L.J. 761; Wertham, *Psychoauthoritarianism and the Law* (1955) 22 U. Chi. L.Rev. 336. Indeed, the trend if anything is away from dogmatic certainty and agreement: as recently pointed out by a psychiatrist experienced in the treatment of offenders, ''The intelligent public has the right to know that, today, psychiatry is in ferment—many concepts, held for decades to be firmly established, are being increasingly challenged, and fundamental divergencies are developing among its leading exponents on almost every issue of psychiatric diagnosis, therapy, and prophylactic recommendation. This holds true to an even greater degree for legal psychiatry. The popular picture painted by its propagandists is sometimes totally unrealistic and irresponsible. Attempts to present a united front to outsiders neither further the cause of psychiatry nor are they socially and scientifically justifiable.'' (Schmideberg, *The Promise of Psychiatry: Hopes and Disillusionment* (1962) 57 Nw.U. L.Rev. 19, 21.)

legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. [Fn. omitted.] This whole problem has evoked wide disagreement among those who have studied it." While attacking the M'Naughton rule (and not differentiating the California rule) amicus curiae does not offer a more workable test in its stead, and in any event fails to demonstrate that the issue is now a judicial rather than a legislative one. As we have repeatedly stated in recent years, the M'Naughton test (of course, as evolved and applied in the California rule) has become "an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature." (*People* v. *Darling* (1962) 58 Cal.2d 15, 23 [9] [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Rittger* (1960) 54 Cal.2d 720, 732 [9] [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Nash* (1959) 52 Cal.2d 36, 43 [1] - 49 [4] [338 P.2d 416], and cases there cited.) Indeed, the entire problem is currently under consideration by that body.[5]

### The Sufficiency of the Evidence of Sanity

Turning now to defendant's more specific contentions, it is first urged that "As a matter of law, [defendant] was legally insane at the time of the commission of the offense." In support of this proposition defendant stresses the fact that each of the four psychiatrists who testified at the trial stated (1) that in his *medical* opinion defendant suffers from a permanent form of one of the group of mental disorders generically known as "schizophrenia" and (2) that defendant was also *legally* insane at the time he murdered his mother. Much confusion has been engendered in this and similar cases by failure to distinguish between these two branches of the testimony and by uncritical acceptance of

[5]On April 10, 1963, Senate Bill No. 1187 was introduced, embodying certain legislative recommendations of the Special Commissions on Problems of Insanity Relating to Criminal Offenders. Section 4 of that bill proposed to add a new provision (§ 26.5) to the Penal Code, declaring that "A person is not criminally responsible for an act if, at the time of the commission of such act, as a substantial consequence of mental disorder, he did not have adequate capacity to conform his conduct to the requirements of the law he is alleged to have violated." After a first reading the bill was sent to the Senate Committee on the Judiciary, where it was referred to the Rules Committee for assignment "to an appropriate interim committee." That committee subsequently assigned the bill to the Senate Interim Committee on the Judiciary for further study.

both as equally "expert." The bases of the psychiatrists' "legal" opinion will be explored hereinafter; on the purely medical question these witnesses agreed (and in this litigation no one disputes their findings) that defendant's illness is characterized by a "disintegration of the personality" and a "complete disassociation between intellect and emotion," that defendant "is not capable of conceptual thinking" but only of "concrete" thinking, and that although his memory is not impaired his judgment is affected "to a considerable degree."

However impressive this seeming unanimity of expert opinion may at first appear (and we give it due consideration not only on the issue of sanity, but also in a subsequent portion of this opinion wherein we discuss the degree of the crime), our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the jury's verdict of sanity (and the trial court's finding as to the degree of the murder) under the law of this state. (*People* v. *Rittger* (1960) *supra*, 54 Cal.2d 720, 733 [9] - 734 [10] ; *People* v. *Berry* (1955) 44 Cal.2d 426, 432 [6] [282 P.2d 861] ; *People* v. *Dennis* (1960) 177 Cal.App.2d 655, 660 [1a] - 661 [1b] [2 Cal.Rptr. 393].) ▪ It is only in the rare case when "the evidence is uncontradicted and entirely to the effect that the accused is insane" (*In re Dennis* (1959) 51 Cal.2d 666, 674 [12] [335 P.2d 657]) that a unanimity of expert testimony could authorize upsetting a jury finding to the contrary. ▪ While the jury may not draw inferences inconsistent with incontestably established facts (*People* v. *Holt* (1944) 25 Cal.2d 59, 70 [6] [153 P.2d 21]), nevertheless if there is substantial evidence from which the jury could infer that the defendant was legally sane at the time of the offense such a finding must be sustained in the face of any conflicting evidence, expert or otherwise, for the question of weighing that evidence and resolving that conflict "is a question of fact for the jury's determination" (*People* v. *Berry* (1955) *supra*, 44 Cal.2d 426, 432 [6]). Indeed, *the code specifically requires that the jury be instructed* (and they were so instructed in the case at bench) that "The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion if it shall be found by them to be unreasonable." (Pen. Code, § 1127b.)

▪ The question of what may constitute substantial evi-

dence of legal sanity cannot be answered by a simple formula applicable to all situations. To begin with, in *In re Dennis* (1959) *supra,* 51 Cal.2d 666, 674 [12], we disapproved an implication in *People* v. *Chamberlain* (1936) 7 Cal.2d 257, 260 [1] - 261 [3] [60 P.2d 299], to the effect that the presumption of sanity alone might be sufficient in the face of uncontradicted evidence of insanity introduced by the defendant. The court in *Chamberlain* also stressed such factors as ''The personal appearance, mannerisms and actions of the defendant before the jurors during the trial, and the character of his testimony and manner of giving it'' (*ibid.*); but evidence of that nature would seem to be of doubtful sufficiency in a case where, as here, defendant's mental illness is not of a type characterized by continual maniacal activity or obvious physical symptoms.

■ Beyond this point, however, it is settled that ''the conduct and declarations of the defendant occurring within a reasonable time before or after the commission of the alleged act are admissible in proof of his mental condition at the time of the offense.'' (*People* v. *David* (1939) 12 Cal.2d 639, 649 [13] [86 P.2d 811]; accord, *People* v. *Kimball* (1936) 5 Cal.2d 608, 610-611 [3] [55 P.2d 483]; *People* v. *Harris* (1914) 169 Cal. 53, 63 [145 P. 520]; *People* v. *Dennis* (1960) *supra,* 177 Cal.App.2d 655, 660-661 [6]; see generally Note 8 A.L.R. 1219 et seq.) In the present case such evidence was introduced, both of defendant's conduct and of his declarations.

■ *Conduct of Defendant as Evidence of Legal Sanity.* Among the kinds of conduct of a defendant which our courts have held to constitute evidence of legal sanity are the following: ''an ability on the part of the accused to devise and execute a deliberate plan'' (*People* v. *David* (1939) *supra,* 12 Cal.2d 639, 647 [9]); ''the manner in which the crime was conceived, planned and executed'' (*People* v. *Darling* (1962) *supra,* 58 Cal.2d 15, 21 [9]); the fact that witnesses ''observed no change in his manner and that he appeared to be normal'' (*People* v. *Caetano* (1947) 29 Cal.2d 616, 620 [5] [177 P.2d 1]); the fact that ''the defendant walked steadily and calmly, spoke clearly and coherently and appeared to be fully conscious of what he was doing'' (*People* v. *Van Winkle* (1953) 41 Cal.2d 525, 529 [2] [261 P.2d 233]); and the fact that shortly after committing the crime the defendant ''was cooperative and not abusive or combative'' (*People* v. *Dennis* (1960) *supra,* 177 Cal.App.2d 655, 658), that ''ques-

tions put to him . . . were answered by him quickly and promptly" (*People* v. *Loomis* (1915) 170 Cal. 347, 349 [149 P. 581]), and that "he appeared rational, spoke coherently, was oriented as to time, place and those persons who were present" (*People* v. *Fraters* (1956) 146 Cal.App.2d 305, 306 [1] [303 P.2d 588]).

In the case at bench there was evidence that in the year preceding the commission of the crime defendant "spent a lot of time thinking about sex." He made a list of the names and addresses of seven girls in his community whom he did not know personally but whom he planned to anesthetize by ether and then either rape or photograph nude. One night about three weeks before the murder he took a container of ether and attempted to enter the home of one of these girls through the chimney, but he became wedged in and had to be rescued. In the ensuing weeks defendant apparently deliberated on ways and means of accomplishing his objective and decided that he would have to bring the girls to his house to achieve his sexual purposes, and that it would therefore be necessary to get his mother (and possibly his brother) out of the way first.[6]

The attack on defendant's mother took place on Monday, May 15, 1961. On the preceding Friday or Saturday defendant obtained an axe handle from the family garage and hid it under the mattress of his bed. At about 10 p.m. on Sunday he took the axe handle from its hiding place and approached his mother from behind, raising the weapon to strike her. She sensed his presence and asked him what he was doing; he answered that it was "nothing," and returned to his room and hid the handle under his mattress again. The following morning defendant arose and put the customary signal (a magazine) in the front window to inform his father that he had not overslept. Defendant ate the breakfast that his mother prepared, then went to his room and obtained the axe handle from under the mattress. He returned to the kitchen, approached his mother from behind and struck her on the back of the head. She turned around screaming and he struck her several more blows. They fell to the floor, fighting. She called out her neighbor's name and defendant began choking her. She bit him on the hand and

---

[6]Defendant lived with his mother and older brother since his parents were divorced some 13 years previously. However, his father remained on good terms with the family; he drove by their house each morning to ascertain that they had not overslept, and he often ate with them in the evening.

crawled away. He got up to turn off the water running in the sink, and she fled through the dining room. He gave chase, caught her in the front room, and choked her to death with his hands. Defendant then took off his shirt and hung it by the fire, washed the blood off his face and hands, read a few lines from a Bible or prayer book lying upon the dining room table, and walked down to the police station to turn himself in. Defendant told the desk officer, "I have something I wish to report . . . . I just killed my mother with an axe handle." The officer testified that defendant spoke in a quiet voice and that "His conversation was quite coherent in what he was saying and he answered everything I asked him right to a T."

Defendant's counsel repeatedly characterizes as "bizarre" defendant's plan to rape or photograph nude the seven girls on his list. Certainly in common parlance it may be termed "bizarre"; likewise to a mature person of good morals, it would appear highly unreasonable. But many a youth has committed—or planned—acts which were bizarre and unreasonable. This defendant was immature and lacked experience and judgment in sexual matters. But it does not follow therefrom that the jury were precluded as a matter of law from finding defendant *legally* sane at the time of the murder. From the evidence set forth hereinabove the jury could infer that defendant had a motive for his actions (gratification of his sexual desires),[7] that he planned the attack on his mother for some time (obtaining the axe handle from the garage several days in advance; abortive attempt to strike his mother with it on the evening before the crime), that he knew that what he was doing was wrong (initial concealment of the handle underneath his mattress; excuse offered when his mother saw him with the weapon on the evening before the crime; renewed concealment of the handle under the mattress), that he persisted in the fatal attack (pursuit of his

[7]This does not mean, of course, that it was his *only* motive. At different times defendant offered as reasons for the murder the fact that his mother nagged him, that they constantly bickered, and that he was ashamed to bring friends home because his mother did not keep house well. However, the issue is not whether in the opinion of an appellate court such other reasons may somehow be deemed evidence of *in*sanity, but whether the record supports an inference that defendant had an actual —not just imagined or hallucinatory—motivating reason to commit these acts. As observed above, our inquiry must be to determine whether there is substantial evidence to support—not to undermine—the verdict of the jury.

fleeing mother into the front room; actual infliction of death by strangling rather than bludgeoning), that he was conscious of having committed a crime (prompt surrender to the police), and that he was calm and coherent (testimony of desk officer and others). We need not determine whether such conduct would alone constitute substantial evidence from which the jury could find defendant legally sane at the time of the murder, for as will next be shown the record contains further evidence on this issue.

*Declarations of Defendant as Evidence of Legal Sanity.*
█ Oral declarations made by a defendant during the period of time material to his offense may constitute evidence of legal sanity. (*People* v. *David* (1939) *supra,* 12 Cal.2d 639, 649 [12].) In *People* v. *Darling* (1962) *supra,* 58 Cal.2d 15, 21 [9], we referred *inter alia* to statements made by a defendant relating to his "reason for first committing the homicide and later surrendering himself," and held that "such evidence firmly establishes that defendant was aware at all times that his actions were wrong and improper." (See also *People* v. *Fraters* (1956) *supra,* 146 Cal.App.2d 305, 306 [1] [defendant "knew that he had committed the offense and knew the consequences of his act"]; *People* v. *Harmon* (1952) 110 Cal.App.2d 545, 553 [3b] [243 P.2d 15] ["certain portions of defendant's confession tended to indicate a consciousness of guilt and an awareness of the rightness or wrongness of his conduct"].[8])

█ In the case at bench defendant was questioned by Officers Stenberg and Hamilton shortly after he came to the police station and voluntarily announced that he had just killed his mother. The interrogation was transcribed and shown to defendant; he changed the wording of a few of his answers, then affixed his signature and the date on each page.[9]

---

[8]It is true that the *Harmon* opinion (at p. 554 [3b] of 110 Cal.App.2d) cites *People* v. *Chamberlain* (1936) *supra,* 7 Cal.2d 257; it is also true that, as pointed out hereinabove, *Chamberlain* was disapproved in *In re Dennis* (1959) *supra,* 51 Cal.2d 666, 674 [12], insofar as it implied that the presumption of sanity alone might be sufficient to support a verdict of legal sanity in the face of the evidence to the contrary. But the propriety of relying, as in *Harmon,* on the probative value of the defendant's confession as indicating "an awareness of the rightness or wrongness of his conduct" stands unimpaired by *In re Dennis,* for the simple reason that *Chamberlain* did not deal with that type of evidence at all.

[9]This document was read into the record by Officer Hamilton and later admitted into evidence as People's Exhibit 3. But a comparison of the exhibit (which is part of the record in this court) with the version of

When asked by Officer Hamilton why he had turned himself in, defendant replied, ''Well, for the act I had just committed.'' Defendant then related the events leading up to and culminating in the murder, describing his conduct in the detail set forth hereinabove. With respect to the issue of his state of mind at the time of the crime, the following language is both relevant and material: When asked how long he had thought of killing his mother, defendant replied, ''I can't be clear on that. About a week ago, I would suppose, the very beginning of the thoughts. First I thought of giving her the ether. . . . Then Thursday and Friday I thought of it again. Q. Of killing your mother? A. Not of killing. Well, yes, I think so. Then Saturday and Sunday the same.'' After stating that he struck her the first blow on the back of the head, defendant was asked: ''Q. Did you consider at the time that this one blow would render her unconscious, or kill her? A. I wasn't sure. I was hoping it would render her unconscious. Q. Was it your thought at this time to kill her? A. I am not sure of that. Probably kill her, I think.'' Defendant described the struggle in which he and his mother fell to the floor, and was asked: ''Q. Then what happened . . . . A. She moved over by the stove, and she just laid still. She was breathing, breathing heavily. I said 'I shouldn't be doing this'—not those exact words, but something to that effect, and laid down beside her, because we were on the floor. Q. Were you tired? A. Yes.'' After defendant had choked her to death he said, ''God loves you, He loves me, He loves my dad, and I love you and my dad. It is a circle, sort of, and it is horrible you have done all that good and then I come along and destroy it.''

it appearing in the reporter's transcript on appeal discloses that, either through misreading by Officer Hamilton or mistranscribing by the court reporter, the language of the latter version deviates significantly from the original in a number of key questions and answers. Unfortunately, these discrepancies appear to have been overlooked by counsel for defendant, by the Attorney General, and by amicus curiae, each of whom quotes from and relies on portions of the inaccurate language in the reporter's transcript. As a result, counsel for defendant is led to characterize as ''unintelligible'' various answers given by defendant in the course of the interrogation, which answers as actually articulated were quite coherent and reasonable. And much of the psychiatric analysis of the ''facts'' of the case set forth in the appendices to the opening brief of amicus curiae is rendered irrelevant when it is realized that the learned authors are expounding at length on the psychiatric ''meaning,'' when spoken by defendant, of statements that the latter *never actually made.*

Detective Stenberg thereafter interrupted Officer Hamilton's interrogation, and asked the following questions: "Q. (Det. W. R. Stenberg) You knew the wrongfulness of killing your mother? A. I did. I was thinking of it. I was aware of it.[10] Q. You were aware of the wrongfulness. Also had you thought what might happen to you? A. That is a question. No. Q. Your thought has been in your mind for three weeks of killing her? A. Yes, or of just knocking her out.[11] Q. Well, didn't you feel you would be prosecuted for the wrongfulness of this act? A. I was aware of it, but not thinking of it." Officer Hamilton asked: "Q. Can you give a reason or purpose for this act of killing your mother? Have you thought out why you wanted to hurt her? A. There is a reason why we didn't get along. There is also the reason of sexual intercourse with one of these other girls, and I had to get her out of the way.[12] Q. Did you think you had to get her out of the way permanently? A. I sort of figured it would have to be that way, but I am not quite sure."

Thus, contrary to the misunderstanding of counsel and amicus curiae, Officer Stenberg's question ("You knew the wrongfulness of killing your mother?") related unequivocally to defendant's knowledge *at the time of the commission of the murder*; and defendant's equally unequivocal answer ("I did. I was thinking of it. I was aware of it.") related to the same period of time. This admission, coupled with defendant's uncontradicted course of conduct and other statements set forth hereinabove, constitutes substantial evidence from which the jury could find defendant legally sane at the time of the matricide.

It is contended that the foregoing evidence of defendant's conduct and declarations is equally consistent with the type of mental illness (i.e., a form of "schizophrenia") from which, according to the psychiatric witnesses, defendant is said to be suffering. But this consistency establishes only that

[10]When the transcript of the interrogation was subsequently shown to him defendant scratched out the just quoted answer and substituted the words "I knew it was wrong but I wasn't thinking of it." Officer Hamilton testified, however, that the latter words were not part of that conversation with defendant, and that in each instance where defendant had scratched out answers, the original answer was the one actually given by defendant during the questioning.

[11]Defendant scratched out this answer and substituted the words "Two (2) weeks, or of just knocking her out." (See fn. 10, *ante*.)

[12]Defendant changed the first sentence of this answer to read: "There is the reason that we didn't get along." He also added a final sentence to the answer: "I didn't want to hurt her at all." (See fn. 10, *ante*.)

defendant is suffering from the diagnosed mental illness—a point that the prosecution readily concedes; it does not compel the conclusion that on the very different issue of legal sanity the evidence is insufficient as a matter of law to support the verdict. To hold otherwise would be in effect to substitute a trial by "experts" for a trial by jury, for it would require that the jurors accept the psychiatric testimony as conclusive on an issue—the legal sanity of the defendant—which under our present law is exclusively within the province of the trier of fact to determine.

To guard against misunderstanding of our rules it is pertinent to observe that we do not reject expert testimony simply or solely because it may *also* answer the ultimate question the jury is called upon to decide (see, e.g., *People* v. *Cole* (1956) 47 Cal.2d 99, 105 [3] [301 P.2d 854, 56 A.L.R.2d 1435]); but, strictly speaking, a psychiatrist is not an "expert" at all when it comes to determining whether the defendant is *legally* responsible under the terms of the California rule. Thus Dr. Alfred K. Baur, psychiatrist and Chief of Staff of the Veteran's Administration Hospital at Salem, Virginia, has recently warned that the question of a defendant's "insanity" (which he defines as *legal* irresponsibility) should not even be asked of members of his profession: "As psychiatrists, we can testify as to our findings regarding the 'mental condition' of the person in question . . . ; but, to ask the psychiatric witness, 'Doctor, in your opinion is this person insane (or sane)?' is the same as asking an expert witness in a criminal trial, 'In your opinion, is the accused guilty or not guilty?' Yet, many lawyers ask psychiatrists to state opinions on the sanity of the accused and, unfortunately, many psychiatrists perpetuate the problem by accepting the role of oracle and answering the question, even thinking it properly within their functions." (Baur, *Legal Responsibility and Mental Illness* (1962) 57 Nw.L.Rev. 12, 13; for similar views, see Address of Dr. Karl Menninger to the Judicial Conference of the 10th Circuit (1962) 32 F.R.D. 566, 571; Glueck, Law and Psychiatry (1962) pp. 65-67; cf. *People* v. *O'Brien* (1932) 122 Cal.App. 147, 150-154 [2] [9 P.2d 902].)

In the light of the authorities which have been brought to our attention it thus appears that a psychiatrist's conclusion as to the *legal* insanity of a schizophrenic is inherently no more than tentative. As Dr. Manfred S. Guttmacher observes, "in the most malignant type of psychosis, schizophrenia, the decision is often extremely difficult and the psychiatrist,

conscientiously attempting to assay the individual's capacity to distinguish right and wrong will be able to do little more than conjecture. Much, indeed, is known about the schizophrenic disorders at a descriptive level and valid generalizations about the symptomatology can be made. But our methods of examination do not permit us to particularize convincingly in regard to the individual patient.'' (Guttmacher, Principal Difficulties with the Present Criteria of Responsibility and Possible Alternatives, in Model Pen. Code, Tent. Draft No. 4 (1955) p. 171.) In this uncertain state of knowledge, the fact that the four psychiatrists in the case at bench happened each to diagnose defendant's *medical* condition as ''schizophrenia''[13] did not preclude the jury from weighing, as they were required to do, these witnesses' further opinion that defendant was *legally* insane at the time of the murder. Nor is this case unusual in this respect: in accordance with the just mentioned principle, jury verdicts of legal sanity have been upheld in a long line of cases in which the expert medical testimony was unanimous that the defendant was suffering from schizophrenia (e.g., *People* v. *Dennis* (1960) *supra,* 177 Cal.App.2d 655, 660 [4], and cases there cited) and was insane at the time of the offense of which he was convicted (*People* v. *Fraters* (1956) *supra,* 146 Cal. App.2d 305, 306 [1]; *People* v. *Harmon* (1952) *supra,* 110 Cal.App.2d 545, 553 [3a]; *People* v. *Darling* (1951) 107 Cal. App.2d 635, 641 [6] [237 P.2d 691]; *People* v. *Martin* (1948) 87 Cal.App.2d 581, 588-589 [9] [197 P.2d 379]; *People* v. *Denningham* (1947) 82 Cal.App.2d 117, 119-120 [5] [185 P.2d 614]; *People* v. *Babcock* (1943) 57 Cal.App.2d 54, 55-58 [1] [134 P.2d 54]).

To the extent, moreover, that the psychiatric witnesses in the case at bench were asked their opinion as to defendant's legal sanity, a close examination of their responses discloses still further grounds in support of the verdict. The jury were entitled, of course, to consider on this issue the entire testimony of each such witness, including the reasons given

[13]Even on this diagnosis there was not complete unanimity: Dr. Smith testified that defendant's schizophrenia is of the paranoic type, while Dr. Maculans was equally firm in stating that ''In my opinion he is not'' of the paranoic type. Similarly, Dr. Maculans found the incident of defendant's attempting to enter a girl's house through the chimney to be ''very significant,'' whereas Dr. Nielsen said of the same incident, ''You don't have to be a schizophrenic to do that. You can be a psychopath or you can be anything else. . . . It could be due to normal instincts with extremely poor judgment.''

for his conclusion that defendant was legally insane. Dr. Nielsen testified on direct examination that at the time of the murder defendant "knew right from wrong" but was "acting impulsively" and "didn't think it through"; that during the period of the final outburst "He knew what he was doing after all. He studied his mother to see whether she was dead and when she wasn't, he went ahead and finished it." On cross-examination Dr. Nielsen was asked whether defendant's compulsion to kill his mother resembled an "irresistible impulse"; he replied, "It was not resisted and it was an impulse." The doctor further agreed that defendant "was capable at the time, of knowing the difference between right and wrong, but that he didn't bother to think about it"; that defendant "could have and did appreciate what he did," and that "he knew what he did was wrong." The doctor testified that ordinarily a schizophrenic's description of his state of mind during an "outburst" is no more than his own interpretation or rationalization of what happened; but when asked whether a schizophrenic "know[s] in terms of right and wrong what he is doing" during an outburst, the doctor replied: "I don't want to answer that for every case but in this case, yes." Dr. Nielsen further stated that defendant "was hoping to escape by the plan that had been evolved by his father [i.e., by a successful plea of not guilty by reason of insanity] and he may have thought all the time that he could escape"; that while in custody defendant had been reading about schizophrenia in books that his father had furnished him on the subject.

The next psychiatric witness, Dr. Smith, testified that when defendant killed his mother "He was acting on an impulse"; that "his expressions of intention to go out and have intercourse and his intention to knock out his mother and the aunt, if she came, are evidence of his ability to think because of his ability to plan. Now beyond that point of having struck his mother, this is an impulsive schizophrenic piece of behavior which is entirely separated in my opinion from some planned piece of activity."

The final psychiatric witness, Dr. Skrdla, testified on direct examination that at the time of the killing defendant "knew that he had committed a wrong act, at least morally wrong, and possibly legally wrong, because, according to the story he gave me, he washed the blood from himself and changed his clothes, and, a few minutes after the murder, went to the police station to report it. This would indicate that he

recognized that his act was wrong." On cross-examination Dr. Skrdla testified that when defendant killed his mother "he probably did know the difference between right and wrong" but that he was one of those schizophrenics who "because of their emotional problems, their own conflicts, . . . are not able to prevent themselves from going ahead and acting on whatever ideas or compulsions they may have." The doctor agreed that the fact that defendant hid the axe handle under his mattress would indicate that "he didn't want to be caught with that axe handle before he was able to go ahead with the plan" and that "He had appreciation of the fact, perhaps, that it wasn't entirely right, however, he still planned to do it." Dr. Skrdla termed the killing "an automatic act," and explained that "once [defendant] attempted to get his mother out of the way . . . he went on as was described and couldn't stop until she was in fact dead."

■ The doctrine of "irresistible impulse" as a defense to crime is, of course, not the law of California; to the contrary, the basic behavioral concept of our social order is free will.[14] (*People* v. *Nash* (1959) *supra*, 52 Cal.2d 36, 45-46 [1] fn. 5, 53-54; *People* v. *Walter* (1936) 7 Cal.2d 438, 440 [2]

---

[14]In *People* v. *Gorshen* (1959) 51 Cal.2d 716, 723-725 [336 P.2d 492], we had occasion to refer to an article and certain testimony by the prominent psychiatrist, Dr. Bernard L. Diamond, as follows: "In cross-examining Dr. Diamond, the prosecuting attorney quoted the following statements from an article by the doctor entitled '*With Malice Aforethought*' (Archives of Criminal Psychodynamics (1957) vol. 2, No. 1) [fn. omitted]:

" 'Freud, in 1904, brilliantly demonstrated by analysis of slips of the tongue, forgetting, and trains of association that what we call free will or voluntary choice is merely the conscious rationalization of a chain of unconsciously determined processes. Each act of will, each choice presumedly made on a random basis, turns out to be as rigidly determined as any other physiological process of the human body. Yet all of us continue to live our lives, make our choices, exercise our free will, and obey or disobey the law as if we actually had something to say about what we are doing. . . . It does no good to proclaim to the jurist that scientific evidence proves that there is no such thing as free will. . . .'

"The prosecuting attorney then asked, 'you feel there is no such thing as free will?' The doctor replied, 'I believe in what the philosophers call the posit of free will. A posit is a working assumption. When I treat a patient, if I believe as a working assumption, that everything is predetermined or determined by forces outside of the patient's choice and consciousness, there would be no point in my doing psychotherapy or psychoanalysis; because obviously nobody would ever get better. I certainly proceed on the theory that I and our patients have something to say about what I do and about our choices. What I cannot tell you, because there is no scientific proof, is how much. . . . I know that in-

[60 P.2d 990]; *People* v. *Morisawa* (1919) *supra,* 180 Cal. 148, 150, and cases there cited.)

 It is true that certain other psychiatric testimony was to the effect that at the time of the murder defendant did not know the nature and quality of his acts and that what he was doing was wrong. But this created only a conflict in the evidence, which was for the jury to resolve. From the testimony quoted above the jury could infer that even though some or all of the psychiatric witnesses concluded that defendant was "legally insane," there was no basis for that conclusion under the California M'Naughton rule.

Finally, to accept defendant's thesis would be tantamount to creating by judicial fiat a new defense plea of "not guilty by reason of schizophrenia." To do so (assuming *arguendo* that it were within our power) would be bad law and apparently still worse medicine. It would require the jurors to accept as beyond dispute or question the opinions of the psychiatric witnesses as to the defendant's *legal* sanity. But it is doubtful that any reputable psychiatrist today would claim such infallibility;[15] clearly the four who testified in the case at bench did not do so. Thus, Dr. Daryl D. Smith agreed with counsel's assertion with respect to schizophrenia that "there is quite a bit of divergence of [psychiatric] opinion relative to this disease." Indeed, it is often acknowledged that the causes and cure of schizophrenia are unknown (e.g., Diamond, *From M'Naughton to Currens, and Beyond* (1962) 50 Cal.L.Rev. 189, 195; Weihofen, Mental Disorder as a Criminal Defense (1954) p. 16), and that "schizophrenia" is not even a single disease as such but merely a label or term of convenience encompassing a variety of more or less related symptoms or conditions of mental disorder; thus in the case at bench Dr. J. M. Nielsen agreed that "schizophrenia" is "just a psychiatric classification, . . . simply an abstract definition as applied to the behavior pattern."

---

dividuals who are suffering from certain kinds of mental illnesses, tend to have very little to say about many of the things that happen to them; other people have a great deal to say about it. . . . Now, whether or not it could be scientifically demonstrated that in no instance is there any free will, this is something I can't give you any answer to.' "

[15]As Professor Glueck reminds us, "It must be borne in mind that, at best, a psychiatric diagnosis and the *ex post facto* behavioral inferences drawn from it can speak only in terms of probability; rarely, if ever, does the experienced alienist commit himself to anywhere near a dogmatic, hundred percent certainty." (Glueck, Law and Psychiatry (1962) p. 19.)

Such a classification covers a broad spectrum of mental conditions. As Dr. Alfred K. Baur emphasizes, ''Some people are sophisticated enough to know that schizophrenia is one of the 'major psychoses' and contributes to many in the 'insane' category. But it is very difficult to get across to lay people the idea that a person diagnosed schizophrenic may be quite competent, responsible, and not dangerous, and, in fact, a valuable member of society, albeit at times a personally unhappy one. The same can be said of every psychiatric diagnosis or so-called mental illness.'' (Baur, *Legal Responsibility and Mental Illness* (1962) 57 Nw.U.L.Rev. 12, 16-17.) The argument for defendant, in short, ignores our often-repeated admonition that '' 'Sound mind' and 'legal sanity' are not synonymous.'' (*People* v. *Baker* (1954) 42 Cal.2d 550, 568 [9] [268 P.2d 705] ; accord, *People* v. *Gorshen* (1959) *supra,* 51 Cal.2d 716, 729 [7] ; *People* v. *Nash* (1959) *supra,* 52 Cal.2d 36, 45, fn. 4.)

### The Instructions to the Jury

Defendant's second contention is that the trial court gave conflicting instructions on the presumptions of sanity and insanity. The jury were first given the standard instruction (CALJIC No. 801 rev.) that ''The burden of proving insanity is on the defendant. The law presumes that the defendant was sane. The effect of this presumption is to place on the defendant the burden of proving insanity by a preponderance of the evidence.'' The jury were thereafter instructed (CALJIC No. 808) that ''Proof that defendant, before the time when the crime in question was committed, was afflicted with permanent insanity, as distinguished from temporary or transient insanity, will dispel the presumption of sanity and raise a presumption that defendant's insanity continued to exist until the time of the commission of the crime. This presumption is not conclusive but rebuttable, and exists only until the contrary is shown.'' It is argued that these two instructions are in conflict, and that the latter alone should have been given because ''there can be no contention that [defendant] was not suffering from a permanent insanity, to wit: schizophrenia.''

The argument is without merit, for it is based upon a misunderstanding of the different purposes of the two instructions in question. Part of that misunderstanding, it is true, is caused by the language of the ''permanent insanity'' instruction (CALJIC No. 808), which we now examine more closely. This instruction is taken from the following lan-

guage of *People* v. *Baker* (1954) 42 Cal.2d 550, 564 [5] [268 P.2d 705] : "Proof that defendant was afflicted with a permanent insanity, as distinguished from a temporary or transient insanity, prior to the commission of the crime charged will . . . [1] dispel the presumption of sanity and [2] raise a presumption that his insanity continued to exist until the time of the commission of the crime."[16] The purpose of the first branch of the just quoted rule may be easily explained: up to the time of the *Baker* decision it was thought to be the law that the presumption of sanity alone was sufficient evidence, even in the face of uncontradicted evidence of insanity introduced by the defendant, to support a finding that the defendant was legally sane. (*People* v. *Chamberlain* (1936) *supra,* 7 Cal.2d 257, 259, 260 [1] - 261 [3].) The purpose of the first branch of the *Baker* rule—i.e., that proof of prior permanent insanity "will . . . dispel the presumption of sanity"—was only to overcome in such cases this *evidentiary* effect of the presumption of sanity; it did not "dispel" or in any degree shift the defendant's *burden of proving insanity* by a preponderance of the evidence (*People* v. *Baker* (1954) *supra,* at p. 565 [6] of 42 Cal.2d; *People* v. *Grace* (1928) 88 Cal.App. 222, 235 [11] [263 P. 306]). As noted hereinabove, in *In re Dennis* (1959) *supra,* 51 Cal.2d 666, 674 [11-12], we specifically disapproved *Chamberlain* and held that "Where . . . the evidence is uncontradicted and entirely to the effect that the accused is insane, the presumption of sanity may not be permitted to prevail." Thus the *Dennis* decision removed the need for that portion of the *Baker* rule declaring that proof of prior permanent insanity "will . . . dispel the presumption of sanity." Since the reason for the rule has disappeared, in the interest of clarity an instruction embodying the just quoted words should no longer be given. In the case at bench, however, defendant joined in the request that the court give an instruction thus worded, and in any event it was favorable to him.

Since the *Chamberlain* doctrine has been disapproved it becomes apparent that the second portion of the *Baker* rule—i.e., that proof of prior permanent insanity "will . . . raise a presumption that [defendant's] insanity continued to exist until the time of the commission of the crime"—now verges on a redundancy, for in effect it says that permanent insanity is presumed to be permanent. (See 1 Wharton's

[16]The interpolated numbers [1] and [2] have been added for the convenience of the ensuing discussion.

Criminal Evidence (11th ed. 1935) § 152, where it is called a "mere petitio principii.") At most it is a device to justify the admission of evidence of defendant's mental capacity at times prior to the commission of the crime; but in a proceeding of this nature such evidence would be admissible in any event, if within the bounds of materiality. "Strictly, it is not a legal presumption at all, but is only an inference of fact. It is merely one illustration of the broader proposition that 'when the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later* period.' [Wigmore, Evidence (3d ed. 1940) § 437.]" (Weihofen, Mental Disorder as a Criminal Defense (1954) p. 230 (fns. omitted).) The latter proposition is codified in our law as a "disputable presumption" (Code Civ. Proc., § 1963, subd. 32 ["That a thing once proved to exist continues as long as is usual with things of that nature"]).

It follows that there was no conflict in the case at bench with the instruction on the presumption of sanity (CALJIC No. 801 rev.) for as the jury were correctly told, "The effect of this presumption [of sanity] is to place on the defendant *the burden of proving insanity* by a preponderance of the evidence." (Italics added.) That burden is a rule of procedure; it is in no way eliminated—but its onus may be discharged—by the introduction of proof of prior "permanent" insanity, and hence the instruction now challenged was properly given regardless of whether or not there was also evidence of such "permanent" insanity.[17]

### The Degree of Murder

From what has been said it follows that there was no substantial error in the trial on the issue raised by the plea of not guilty by reason of insanity and that the evidence adequately supports the jury's verdict. But another and more substantial problem remains to be considered: the contention that the evidence is insufficient to support the trial court's finding that the murder was of the first, rather than the second, degree. This problem, however, is by no means new to us. In dealing with it we recognize that every relevant and tenable presumption is to be indulged in favor of sus-

---

[17]There is no merit in defendant's subordinate contention that the court erred in refusing his proffered instruction on preponderance of the evidence, as another instruction adequately covering the same subject was given.

taining the judgment of the trial court; but when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second degree and affirm it as modified.

As hereinabove mentioned, by stipulation of the parties the question of the degree of the crime was submitted to the court on the basis of the evidence introduced at the trial on the plea of not guilty by reason of insanity, as augmented by the report of the probation officer. To confidently resolve the issue it is essential that we identify the elements which (insofar as relevant to the facts of this case) should as a matter of law be given weight as characterizing, distinguishing, or differentiating, the two degrees of murder. In *People* v. *Holt* (1944) *supra*, 25 Cal.2d 59, 83 [9], we said "Murder, and this, of course, includes murder of the *second* degree as well as murder of the first degree, is defined as 'the unlawful killing of a human being, with malice aforethought.' (Pen. Code, § 187.) . . .

"The legislative definition of the degrees of murder leaves much to the discretion of the jury in many cases. That discretion, however, must have a sound factual basis for its exercise, as hereinafter is more particularly discussed. The Penal Code (section 189) declares that 'All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree.'

 [And on p. 84 [10-11] : "Obviously the homicide in this case was not perpetrated by means of poison, or lying in wait, or torture, nor was it committed in the perpetration of or attempt to perpetrate any of the enumerated felonies. Hence, if it is first degree murder it must come within the classification of 'any other kind of willful, deliberate, and premeditated killing.' But homicide to amount to even second degree murder must be 'the unlawful killing of a human being, with malice aforethought.' The malice which is one of the two essential elements of the offense—whether of the first or of the second degree—is defined by section 188 of the Penal Code. 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when

the circumstances attending the killing show an abandoned and malignant heart.' ''

As noted in *Holt* (p. 86 of 25 Cal.2d) there has sometimes appeared to be a tendency to emasculate the distinction between the two degrees of murder. ▮ In *Holt* we declared firmly against any such emasculation (*id.* at pp. 89 [12]-90 [14]) : ''Regardless of imperfection of academic concept either in the statutory law as enacted or in some of the decisions interpreting it, we are faced with the task of making practical application of that law to actual facts. In such application certain principles are entitled to recognition. Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again *dividing the offense of murder into two degrees is a further recognition* of that infirmity and *of difference in the quantum of personal turpitude of the offenders. . . .* The victim of manslaughter or second degree murder is just as dead as is the victim of first degree murder. The law has fixed standards by which such *personal depravity of the offender*; i.e., the character of the particular homicide, *is to be measured.* When the homicide is perpetrated by means of poison, or lying in wait, or torture, or in the perpetration of or attempt to perpetrate the enumerated felonies the standard is definite and no difficulty in fixing the degree ensues. ▮ But when it is claimed that the homicide is by 'any other kind of willful, deliberate, and premeditated killing' there is necessity for an appraisal which involves something more than the ascertainment of objective facts. This appraisal is primarily a jury [or trial court] function and within a wide field of discretion its determination is final. ▮ But as is true as to all factual issues resolved by a jury [or trial court], the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. To the extent that the character of a particular homicide is established by the facts in evidence the jury is bound, as are we, to apply the standards fixed by law.'' (Italics added.)

Holt had been convicted of first degree murder and sentenced to death. After reviewing the governing law as above set forth we scrutinized the evidence and pointed out that, as analyzed, it demonstrated that the defendant at the time of the shooting did not have a premeditated specific intent to kill. Accordingly, we modified the judgment to murder of the second degree and affirmed as modified. In the case at bench there is no question that the defendant had the

intent to kill; but the mental infirmity of this defendant presents a very serious factual problem as to the quantum of his personal turpitude and depravity as inherently related to the degree of the murder.

■ Again, in *People* v. *Thomas* (1945) 25 Cal.2d 880 [156 P.2d 7], we were required to discuss the import of the language used in Penal Code section 189, and after quoting it, said at pages 899 [14]-900 [15] : ''In construing criminal statutes the *ejusdem generis* rule of construction is applied with stringency. (*Matter of La Societe Francaise* (1899) 123 Cal. 525, 531 [56 P. 458, 787] ; *People* v. *McKean* (1925) 76 Cal.App. 114, 121 [243 P. 898].) Hence, the more general words 'or any other kind of willful, deliberate, and premeditated killing,' following the specifically enumerated instances of killing which are expressly declared to constitute murder of the first degree, must be construed in the light of such specifically listed types and be held to include only killings of the same general kind or character as those specifically mentioned. By conjoining the words 'willful, deliberate, and premeditated,' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill. . . .

''. . . Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under different circumstances. The true test is not the duration of time as much as it is the *extent of the reflection*.'' (Italics added.)

■ In the case now at bench, in the light of defendant's youth and undisputed mental illness, all as shown under the California M'Naughton rule on the trial of the plea of not guilty by reason of insanity, and properly considered by the trial judge in the proceeding to determine the degree of the offense, the true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. In *Thomas,* we found prejudicial error but concluded that (p. 905 [22b] of 25 Cal.2d) ''Having examined the record . . . we do not feel constrained to hold that the evidence is legally inadequate to support a verdict of murder

of the first degree. Hence, we are not authorized to reduce the judgment under our view of section 1181, subdivision 6 of the Penal Code.'' Accordingly, we reversed the judgment.

In *People* v. *Bender* (1945) 27 Cal.2d 164 [163 P.2d 8], we again considered the elements of proof essential to sustain a finding (on the theory of premeditation and deliberation) that a murder was of the first, rather than the second degree. We reiterated that in the circumstances of that case (p. 185 [21] of 27 Cal.2d), ''The true test is not the duration of time as much as it is the extent of the reflection.'' We held that the evidence was insufficient to sustain a finding of first degree murder, modified the judgment by reducing it to murder of the second degree, and affirmed it as modified.

Certainly in the case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with realization of the enormity of the evil, appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached. We think that our analysis in *Holt* of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender,* fits precisely this case: that the use by the Legislature of ''wilful, deliberate, and premeditated'' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill. It bears repeating (*People* v. *Holt* (1944) *supra,* 25 Cal.2d 59, 89 [12]) that ''Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again dividing the offense of murder into two degrees is a further recognition of that infirmity and of difference in the quantum of personal turpitude of the offenders. The difference is basically in the offenders . . .''

The foregoing discussion disposes of any basis for urging that defendant's preparations and procedures might be deemed to constitute a form of "lying in wait" (see *People v. Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1]) and that therefore he is necessarily guilty of first degree murder. It must be remembered that "lying in wait" is simply evidence which, if unexplained and unqualified by other evidence, would ordinarily establish that the perpetrator was guilty of a "wilful, deliberate, and premeditated killing" (Pen. Code, § 189). But here, as emphasized above, the controlling issue as to degree depends not alone on the character of the killing but also on the quantum of personal turpitude of the actor. And in this case, as in *Holt*, the difference is basically in the offender.

Upon the facts, upon the law, and for all of the reasons hereinabove stated we are satisfied that the evidence fails to support the finding that the murder by this defendant, in the circumstances of his undisputed mental illness, was of the first degree, but that it amply sustains conviction of second degree murder.

The fact that we reduce the degree of the penal judgment from first to second degree murder is not to be understood as suggesting that this defendant's confinement should be in an institution maintaining any lower degree of security than for persons convicted of murder of the first degree. To the contrary, we approve of the trial court's recommendation that defendant be placed in a hospital for the criminally insane of a high security character, such as the California Medical Facility at Vacaville where he is presently confined.

For all of the reasons above stated, the judgment is modified by reducing the degree of the crime to murder of the second degree and, as so modified, is affirmed. The cause is remanded to the trial court with directions to arraign and pronounce judgment on defendant in accordance with the foregoing ruling.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.