[Crim. No. 13454.    Second Dist., Div. One.    Dec. 7, 1967.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  MONTELL
RICE  MEACHAM,  Defendant  and  Appellant.

Pollock, Pollock & Fay, Eugene P. Fay and Edward I. Pollock for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—Montell Rice Meacham appeals his conviction by the trial court, sitting without a jury, on one count of bribing a public official in violation of Penal Code, section 165, a felony.

Appellant was charged with five counts of bribery of a city councilman (Pen. Code, § 165) and was charged in the sixth count with bribery of an executive officer (Pen. Code, § 67). The court found him guilty of counts I through V and not guilty as to count VI. Appellant was granted a new trial as to counts I through IV and those counts were thereupon dismissed. As to count V, proceedings were suspended and appellant was placed on probation for a period of three years on condition that he pay a $5,000 fine and penalty assessments; from this judgment he appeals.

Meacham owned and operated two licensed beer taverns, the Barbary Coast on Western Avenue in Los Angeles County

and the Barbary Coast Junior (hereinafter sometimes referred to as the Junior) within the boundaries of the City of Lawndale. In June 1965, upon the advice of counsel, that under existing law it was not unlawful to display waitresses in topless attire, Meacham instituted the use of so-called "topless waitresses" at the Barbary Coast. The episode which culminated in his conviction of bribery took place immediately following his introduction of topless service at the Junior on January 8, 1966.

On the evening of that day James W. Vigneau and Marvin J. Schwarzwalter, both councilmen of the City of Lawndale, visited appellant at the Barbary Coast. Vigneau, owner of a contract janitorial company, was then mayor of the city and Schwarzwalter, employed by an electrical company, was also a deputy sheriff. This was the first time the three had met except for one occasion in the fall of 1965 when Vigneau and Schwarzwalter, accompanied by Deputy Sheriff Ed Sampson, stopped in one evening at the Barbary Coast and were assured by Meacham, in response to their questioning, that he did not contemplate having topless waitresses at the Junior.

Vigneau and Schwarzwalter testified that on January 8 they went into appellant's office and Vigneau asked why he "went topless" in Lawndale. Appellant replied that he could not afford to refrain from that activity because the area was ripe for such an innovation and he had an investment there, not only at the Junior, but at a proposed location on Prairie Avenue. Furthermore, Meacham said that since the use of "topless waitresses" was an area pre-empted by the state, which had no prohibitive legislation, he was conducting a legal enterprise and he would change only if topless was legally prohibited. He suggested that Vigneau and Schwarzwalter should consider becoming his nondisclosed or silent partners without investment which he would arrange if they would cooperate. Although the councilmen threatened that they would take every legal means to fight his use of topless waitresses, Meacham repeatedly refused to discontinue the activity because of the profit he was making on his investment. Finally, appellant invited the councilmen to visit him at his home the next afternoon (Sunday) to meet Berrien Moore, his partner and a licensee in the Junior. Believing there was a good chance that they could convince appellant and his partner to remove the topless operation from Lawndale, the councilmen did not report to the police appellant's bribery offers.

The following afternoon they visited appellant and spent several hours at his home, where they once again requested appellant to stop the topless activity. Meacham then offered to give them "$50,000 to be deposited in any bank at any place at any time" if they would "join in a partnership arrangement. . . ." and if the city would cease actively fighting his topless bars. When both declined that offer, Meacham suggested that since the councilmen had political ambitions, he might help them by contacting Glenn Anderson or by putting $15,000 into a campaign fund for their benefit, but they pointed out that the amount suggested as a campaign contribution was absurd because campaign expenditures in Lawndale were minimal. Next, Meacham offered the councilmen $200 a week for each topless bar that he was able to operate in the city without interference, which they also rejected. Before the councilmen left his home, Schwarzwalter admired appellant's portable beer bar and appellant offered to let him take it home, but Schwarzwalter declined. Although Meacham said that Moore was due at 1:30, his partner never appeared and appellant made no effort to contact him despite Vigneau's request.

As the councilmen were leaving, appellant suggested that Vigneau's janitorial company might have the cleaning contract for appellant's taverns or that Schwarzwalter's employer might purchase business gifts at lower cost through appellant's package liquor store. When Vigneau commented that appellant that day acted like a garbage collector or contractor, appellant said that he would remove topless waitresses if he could obtain a taxi or garbage operation in Lawndale. All of Meacham's suggestions having been rejected, he finally alluded to the taxi operation he had successfully conducted in Hawthorne with political cooperation, intimating that the Lawndale councilmen were no different from other city officials and advising them to cooperate with him on obtaining a taxi franchise in Lawndale. After this visit, Schwarzwalter had no further contact with appellant.

As they left Meacham's home, the councilmen discussed what they should do about the bribery offers and it was agreed that Schwarzwalter should refer the matter to Captain Snover, Commander of the Lennox sheriff's office, the first thing in the morning. Vigneau himself contacted the sheriff's department in the morning to confirm arrangements to meet Captain Snover for dinner, and he also notified the office

about Meacham's bribery attempt. That evening the three met in the dining room of the Alondra Club for dinner and Captain Snover suggested that Vigneau use sound equipment to obtain evidence of the bribery attempts, but no specific arrangements were made. Around 7:30 p.m. the three visited the Barbary Coast in search of appellant. He was not there so Vigneau called his home and told appellant that he was going to have the public welfare commission review appellant's entertainment license for the Barbary Coast, appellant's most profitable enterprise. Meacham suggested in response that he visit Vigneau's office the next afternoon.

The next day was January 11 and Meacham indeed went to Vigneau's office around 3 p.m. Vigneau recorded on an office dictating machine, which stood on top of his desk, the first 10 or 12 minutes of their conversation, which lasted about 45 minutes. Appellant admitted that although his wife opposed and his children did not know about his use of topless waitresses, he found the business profitable and wished to provide his family with material advantages. When Vigneau reiterated that the council would be forced to fight to stop Meacham's operation, Meacham requested that no steps be taken until he could meet once more with Vigneau and Schwarzwalter, perhaps Saturday evening, but Vigneau declined.

Thereafter specific plans were laid to obtain evidence against Meacham. On Friday, January 14, at a luncheon meeting attended by the Lawndale council and members of the press, as well as other city officials, Vigneau addressed the assembly and publicly alluded to the recent bribery attempt by a local bar owner. Captain Snover interrupted him in an effort to protect the investigation against appellant, and he requested those present to remain silent. Following the meeting, Vigneau discussed the investigation with members of the sheriff's department.

Finally, on Saturday, January 15, 1966, five intelligence officers from the sheriff's department set up electronic listening devices on Vigneau's telephone, in his office and the adjacent rooms. Vigneau then called Meacham and advised him that Vigneau and Schwarzwalter would be unable to meet with him that evening and besides they felt that nothing could be gained from such a meeting. Meacham suggested that they might meet at another time or place, but Vigneau said he would rather meet Meacham alone. He claimed that Schwarzwalter was suspicious. When Vigneau suggested that appellant

stop by his office before 6 p.m. because no one was there and they could have a drink together, Meacham agreed.

The sheriff's officers concealed themselves before Meacham arrived around 4 p.m. Vigneau and Meacham went directly into the kitchen where Vigneau prepared drinks. He then laid out on the table various ordinances that the city council was purportedly considering, explained them to Meacham, and together they discussed the ordinances, state pre-emption, and the whole problem of legal control of topless waitresses. Vigneau then inquired whether Meacham had been bluffing or trying to stall the councilmen when he had earlier offered to deposit $50,000 in the bank, or if he really meant it when he offered them $15,000 for a political campaign, or if he was serious when he offered a flat sum of money for each topless bar he was allowed to operate unhindered. Meacham at first made no direct response, but expressed concern about involving others besides Vigneau, said he did not want to talk about the subject any more and that anyhow he had only about $35,000 in cash. Vigneau pressed the subject, saying he could make no promises without some concrete offer, and Meacham then suggested a silent partnership to enable Vigneau to share profits without making an investment, but he admonished Vigneau that neither his other partners nor anyone else should know about their arrangement. Meacham added that one of his friends would pay $5,000 to obtain a taxi franchise, that a lot of money could be made in a legitimate taxi operation, and that the transaction would be worth $2,500 to each of them.

Thereafter, the men considered how long it might be, by state legislation or otherwise, before Lawndale might be permitted to draft and pass an enforceable ordinance eliminating topless waitresses. They concluded that it would be a year or more, and that Vigneau might delay city action even longer. During their conversation Vigneau occasionally intimated that he could hurt Meacham through "his pocketbook" or his family or by having his Barbary Coast entertainment license revoked, and by similar efforts sought to have Meacham reiterate and reaffirm his earlier offers. Appellant suggested that Vigneau should cooperate with him "for $100 a week for the first four weeks," then hesitated in concern that Vigneau might interpret his offer as a bribe. Meacham explained further that he intended to manage bars operated by others and emphasized that for each one that operated topless "you get $100 a week" which might total $500 or $600 each week. He

first suggested that he pay Vigneau for cleaning products on an invoice, but later it was determined that Vigneau should call appellant each week under the code name ''George White'' to make arrangements for the payoff. With that Meacham placed $100 in $10 bills on the table saying, ''Now this is the soap, the soap that you left—.'' Suddenly Meacham became suspicious again and began to search for a microphone, while Vigneau purported to assist him. Meacham then pointed out that Vigneau's change in attitude was suspect, but Vigneau explained that this was because Meacham's earlier advances had been made in Schwarzwalter's presence, and Vigneau wanted to insure that there would be no witnesses to the offer or acceptance of a bribe.

Shortly thereafter Meacham left Vigneau's office and the sheriff's officers entered the kitchen, where Sergeant Martin found and took into custody the $10 bills which he found on the kitchen table. Two days later Meacham was arrested and charged with the crime of offering and giving a bribe with the intent to corrupt and attempt to bribe a public official.

Meacham, testifying in his own defense, denied that he had at any time offered Vigneau or Schwarzwalter a bribe for any purpose, and stated that although he had listened to the tape recording of his January 15th conversation with Vigneau, he did not recall offering or giving Vigneau a bribe. Concerning his use of topless waitresses in Lawndale, Meacham said he told the councilmen that his partner, an attorney, assured him that there was no ordinance to prevent the use of topless waitresses in the city. He said that in making a decision to cease that activity he had to consider his partner, who would be coming to his home on Sunday afternoon; the councilmen suggested that they meet the partner then. He denied offering to make the councilmen silent partners or to give them any other financial interest in his businesses. The next afternoon his partner failed to appear as anticipated, so he merely had a few drinks with the councilmen and they engaged in conversation centering about Meacham's home, clothes and family. Meacham explained that the garbage contract was Schwarzwalter's suggestion, while Vigneau initiated discussion concerning the use of his janitorial service for Meacham's taverns. Meacham specifically denied offering $15,000 as a campaign contribution or $50,000 to be placed in the bank. The councilmen laughed and jested, and said they would simply have to draw up an ordinance to get rid of the topless waitresses. Despite the pressure exerted upon him at the vari-

ous meetings with Vigneau and Schwarzwalter, Meacham claimed never to have made offers calculated to influence Vigneau's vote or to induce him to be easy in his treatment of Meacham. Meacham further claimed that he had no intent to offer Vigneau a bribe when he visited Vigneau's office on January 15. He said that before he arrived at Vigneau's office, he stopped for a few drinks. He had had no lunch and, after the additional drinks which Vigneau served him, he became intoxicated. He testified that thereafter he remembered nothing clearly; in fact he only vaguely recalled seeing his bookkeeper, Cecilia Root, and her husband after he left Vigneau's office.

Meacham's state of intoxication the evening of January 15 was confirmed by the Roots and by his wife. The Roots saw Meacham driving along Hawthorne Boulevard that evening and blew their horn which Meacham at first disregarded, but several blocks farther on he responded and invited them to follow him home. Although he was already in the house when they arrived, they entered at his wife's invitation and found Meacham intoxicated, loud and incoherent. Meacham's wife said that when he arrived home the evening of January 15 his face was very red, his speech slurred, his talk disjointed, and he smelled of whiskey. He had just entered the house and lain down upon the couch when the Roots arrived. They had some conversation and left early; Mrs. Meacham went to bed around 11 p.m., but was unable to rouse her husband and left him sleeping on the couch.

Psychiatrist John Paul Walters testified in Meacham's defense that alcohol intoxication can render a person incapable of entertaining the intent to bribe. Prior to the trial Doctor Walters listened to the recorded conversation and made a psychiatric examination of appellant; Meacham told the psychiatrist that he had six or eight double shots of whiskey at Vigneau's office. It was Doctor Walters' opinion, based upon his observations of Meacham's personality and background, that Meacham on January 15 had no intent to bribe Vigneau. He found appellant to be a simple straightforward man who would have launched directly into a bribery offer had that been on his mind at the time. Doctor Walters believed that Meacham's intoxication, which he found demonstrated on the tape recording, impaired appellant's ability to appreciate the significance of what he said and to perceive nuances of conversation, as well as impairing his ability to form the intent to bribe. The psychiatrist admitted, however,

that he failed to note in the recorded conversation Meacham's expressed suspicion that listening devices might have been installed in Vigneau's office, and acknowledged that this might have accounted for Meacham's initial reticence in approaching a bribery offer. Doctor Walters also conceded that he relied principally upon Meacham's own statements concerning his drinking capacity and the quantity of whiskey he consumed on January 15 in determining that Meacham was intoxicated.

Appellant contends that the evidence establishes that he was entrapped into giving a bribe to councilman Vigneau, as charged in count V. The defense of entrapment is available where the crime perpetrated was not initially contemplated by the defendant, but was in fact planned and instigated by police officers, or those acting under their direction, and the defendant was, by persuasion or fraud, lured into its commission. (*People* v. *Perez,* 62 Cal.2d 769, 775 [44 Cal.Rptr. 326, 401 P.2d 934]; *People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928]; *People* v. *Monteverde,* 236 Cal.App.2d 630 [46 Cal.Rptr. 206]; *Sorrells* v. *United States,* 287 U.S. 435, 453, 457 [77 L.Ed. 413, 423, 425, 53 S.Ct. 210, 86 A.L.R. 249]; *Sherman* v. *United States,* 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819].) Entrapment may be shown as a matter of law in certain cases (*Sherman* v. *United States, supra,* p. 373 [2 L.Ed.2d p. 851]), and when it is thus disclosed ''the court has a duty to root its effects out of the trial upon its own initiative if necessary.'' (*People* v. *Perez,* 62 Cal.2d 769, 775 [44 Cal.Rptr. 326, 401 P.2d 934].) Appellant argues that the classic elements of entrapment under California law appear from the evidence: the original contact was initiated solely by Vigneau acting under the direction of sheriff officers; Vigneau, by direct and indirect solicitation, made repeated and unsuccessful attempts to have appellant offer him a bribe; the bribe was finally produced, but only as a result of the inordinate and abnormal pressure applied by Vigneau (*People* v. *Marsden,* 234 Cal.App.2d 796, 798-799 [44 Cal.Rptr. 728]). Conceding that the objectionable element in entrapment is active police enticement of an individual to engage in incriminating conduct, we find no evidence of such activity in this case.

The specific intent to commit the crime of bribery is an essential element of the charge, but the trier of fact may resort to circumstantial evidence to determine its existence, and circumstantial evidence may also be utilized to determine

whether the intent originated with the defendant or was implanted in his mind by police officers. ▉ In the instant case Meacham was approached by city officials with the request that he stop using topless waitresses. All assumed the request could not be legally enforced, but all were nonetheless aware that indirect pressures might be brought to bear. Meacham's initial response was to see what it might be worth to these gentlemen to leave him alone with his profitable operation. On several occasions he made efforts supported by specific financial promises to induce them to suffer his activity and he never withdrew from this posture. Ultimately Vigneau provided Meacham with the obvious opportunity to act upon his earlier suggestions, and the sheriff's department cannot be criticized because Meacham took advantage of his opportunity and proved their assumptions correct. Vigneau, on his first contact with appellant, told him of his plans to prevent the use of topless waitresses in Lawndale. We find nothing in the record to support appellant's conclusion that at the time of the first meeting the officers from the sheriff's department had conceived a plan to induce a bribe from appellant. Vigneau testified that they visited appellant personally instead of instituting immediate legal action to suspend the topless operation in Lawndale because the city was financially unable to undertake litigation and there was a natural reluctance with respect to having the city become involved in a dispute over the use of topless waitresses. Meacham, on the contrary, attempted to bribe both Vigneau and Schwarzwalter on January 8, and he later confirmed and reiterated his offers. There can be no doubt that the intention was present in Meacham's mind, as was clearly manifested by his conduct, to protect his interests, and to bribe in order to obtain his goal. He merely used the opportunity in Vigneau's office to complete the transaction.

▉ In California "the availability of the defense [of entrapment] depends upon whether the intent to commit the crime originated in the mind of the defendant or in the mind of the entrapping officer [citations], and that where a defendant has a preexisting criminal intent, the fact that when solicited by a decoy he commits a crime does not show entrapment [citations]. Similarly, the United States Supreme Court says that the defense is available 'when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order

that they may prosecute,' but 'the fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment.' [Citations.]" (*People* v. *Benford, supra,* 53 Cal.2d 1, 10.)

Entrapment is not shown as a matter of law where substantial evidence appears in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused, in which event the trial court's determination of guilt should be upheld on appeal. (*People* v. *Terry,* 44 Cal.2d 371, 372-373 [282 P.2d 19].)  "If the doing of an act is a crime and the criminal intent originated in the mind of the accused and the offense is completed, the fact that the officer appeared to cooperate by furnishing opportunity or otherwise aiding the offender in order to facilitate the consummation of the act is not a defense. [Citations.]" (*People* v. *Finkelstin,* 98 Cal. App.2d 545, 553 [220 P.2d 934].)

Appellant further contends that Vigneau's threats to expose his family to unfavorable publicity, to enact prohibiting ordinances, and to seek the revocation of the Barbary Coast's entertainment license, constituted police efforts to threaten and intimidate a reluctant and extremely impressionable person into committing a crime by the use of improper coercion. The record belies this contention. It discloses instead that all transactions took place in an atmosphere of friendliness in which Vigneau explored frankly the avenues that were open to the city council in its effort to have appellant discontinue the disapproved activity. Vigneau did not confront Meacham with threats and alternative promises of cooperation for a price. Although the court was uncertain whether the earlier offers constituted the crime, it felt that there was no question that appellant's activities indicated an intention to bribe and it found the actual bribery offer made beyond a reasonable doubt the afternoon of January 15, 1967. Not only is there no indication that Meacham felt coerced or intimated, but the law referred to by appellant and prohibiting the use of improper influence to extract an involuntary confession in violation of the individual's constitutional rights has no application to these circumstances. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

Appellant claims that the evidence is insufficient as a matter of law to support his conviction. He emphasizes that

Vigneau served him a quantity of whiskey calculated to cause him to become intoxicated and thus rendered him incapable of forming the requisite intent to bribe. He contends that the evidence of his intoxication is uncontradicted and that he does not have an independent recollection of the events of the evening of January 15 as a result of his condition. Appellant thus attempts to persuade the court to draw inferences favorable to his position. ▉▉▉▉ ''Where evidence, circumstantial or otherwise, establishes that a crime has been committed and that the accused was the perpetrator thereof, an appellate tribunal in reviewing a conviction will not appraise the weight of the evidence but will consider and determine only whether upon the face of the evidence it can justly be held that the trier of facts could not have found sufficient facts to warrant the inference of guilt.'' (*People* v. *Mangiameli,* 149 Cal.App.2d 642, 644-645 [308 P.2d 762].) ▉▉▉▉ As we have pointed out, there is substantial evidence in the record that Meacham entertained a corrupt intent; it is not our prerogative to reweigh that evidence. Although Meacham and his psychiatric expert testified that he was intoxicated, Vigneau said that he poured only three drinks for Meacham. The trial court listened to the taped conversation and was entitled to reach its independent conclusion as to the degree of appellant's intoxication and its effect. The court could accept as true a portion of appellant's testimony and disregard that portion it considered dubious. (*People* v. *Crooker,* 47 Cal.2d 348, 355 [303 P.2d 753].) Nor was the trial court bound to accept in its entirety the opinion of the psychiatric expert as to appellant's mental condition (*People* v. *Wolff,* 61 Cal.2d 795, 804-806 [40 Cal.Rptr. 271, 394 P.2d 959].) As we have shown, the limitations of the psychiatrist's observations were brought out at the trial.

Appellant finally contends that the trial court should have granted his motion for a new trial as to count V on the basis that he feels that the trial court was impressed with the overt acts of bribery, as shown on the latter portion of the tape, to prove appellant's ''origin of intent.'' Appellant argues that the commission of the offense itself cannot be evidence of a disposition to commit the crime and that the intent must originate with the defendant at an earlier time. Appellant reiterates that the evidence relating to count V reveals that the intent originated with Vigneau, which returns us to the argument of entrapment earlier rejected in this opinion. ▉▉▉▉ A motion for new trial is addressed to the sound dis-

cretion of the trial court and its determination will not be disturbed on appeal without a clear showing of an abuse of discretion. (*People* v. *Bittick*, 177 Cal.App.2d 479, 483 [2 Cal. Rptr. 378].) No abuse of discretion has been shown.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 2, 1968, and appellant's petition for a hearing by the Supreme Court was denied January 31, 1968.