EDMUND G. BROWN JR. Attorney General MARC J. NOLAN Deputy Attorney General
THE HONORABLE JIM BATTIN, MEMBER OF THE STATE SENATE, has requested an opinion on the following questions:
1. Would a memorandum of understanding between a county and certain cities within the county, under which the county would agree to implement certain land use development standards within each city's sphere of influence in exchange for the cities' agreement to adopt resolutions in support of a county-favored multiple species habitat conservation plan, amount to an illegal exchange of votes within the meaning of Penal Code section 86?
2. If not, would such a memorandum of understanding, and an associated agreement between the cities, county, and various federal, state, and local agencies to implement the multiple species habitat conservation plan, continue in effect even as the memberships of the legislative bodies of the county and signatory cities change over time? *Page 2 
 CONCLUSIONS
1. A memorandum of understanding between a county and certain cities within the county, under which the county would agree to implement certain land use development standards within each city's sphere of influence in exchange for the cities' agreement to adopt resolutions in support of a multiple species habitat conservation plan, would not, in itself, amount to an illegal exchange of votes within the meaning of Penal Code section 86.
2. The proposed memorandum of understanding, and an associated agreement between the cities, county, and various federal, state, and local agencies to implement the multiple species habitat conservation plan, would continue in effect even as the memberships of the legislative bodies of the county and signatory cities change over time, provided that the agreements do not purport to surrender the "police power" of any of the local agencies involved.
 ANALYSIS
We are informed that a county and certain cities within that county propose to enter into a memorandum of understanding (MOU) regarding land use and development within a region of the county in which the cities are located. The proposed MOU resulted from negotiations between the county and the cities, in which the county sought to implement a multiple species habitat conservation plan in the region. The conservation plan was developed by various local, state, and federal officials and agencies, and its stated purpose is to conserve over 240,000 acres of open space and protect 27 plant and animal species within the region. Among other things, the conservation plan would require participating local agencies to implement, within their respective jurisdictions, a coordinated permitting program that regulates and extracts fees for land development that occurs within the plan's geographical area.
According to the recitals in the proposed MOU, the cities have conditioned their support for the conservation plan upon the resolution of certain "county/city issues" involving the specification of land use development standards within city "spheres of influence." The city spheres of influence consist of adjacent or surrounding unincorporated areas of the county, currently outside each city's jurisdiction, where the county's development standards would ordinarily govern.[1] Under the proposed MOU, the cities *Page 3 
would adopt resolutions in support of the conservation plan, and the county would, within each signatory city's sphere of influence, implement the development standards used within the city's jurisdictional limits where those standards are more strict than the county's, and implement the county's development standards where they are more strict than the city's.[2] We have also been directed to an associated proposed agreement between the cities, county, and various federal, state, and local agencies to implement the conservation plan, which establishes the rights and obligations of the various participants in the conservation plan.
We are asked to consider two questions concerning the circumstances described above. First, does the proposed MOU amount to an illegal exchange of votes within the meaning of Penal Code section 86, a statute that prohibits public officials from asking for, receiving, or agreeing to receive bribes in exchange for their votes or other official actions, and from giving, or offering or promising to give, "any official vote" in exchange for another public official's vote on the "same or another question"?[3] And, if not, would the proposed *Page 4 
MOU and the associated implementing agreement continue in effect despite the fact that the membership of the governing bodies that entered into those agreements may change over time? For the reasons that follow, we find that the proposed MOU does not, in itself, amount to an illegal exchange of votes, and that the proposed MOU and the associated implementing agreement will continue to bind successive legislative bodies, provided those agreements do not purport to cede or impair the police power of any of the local agencies involved.
1. Penal Code Section 86
First, there is no indication or even a suggestion that the proposed MOU will result from a completed or attempted bribe within the meaning of section 86. The term "bribe" when used in the penal statutes "signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity."[4] In describing the intent component of the crime of bribery, an act undertaken "`corruptly' imports a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person."[5] The proposed MOU, at least on its face, provides no basis to conclude that any individual or group has wrongfully sought such an advantage, much less offered a public official anything of value in an attempt to secure it.[6] *Page 5 
There is also no indication that any of the votes that may be cast in favor of (or against) entering into the proposed MOU will be illegally traded. In other words, we have no reason to conclude that any county supervisor or city council member called upon to vote on the question of whether to commit his or her local agency to the proposed MOU will condition his or her vote on some other public official's vote "on the same or another question" within the meaning of section 86. Rather, it has been suggested that the proposed MOU will necessarily result in a violation of section 86 on account of the mutual obligations to which the respective governing bodies will commit themselves under that agreement. Thus, we focus our analysis on whether the proposed MOU would, in itself, amount to an illegal exchange of votes under section 86. Put another way, would adoption of the proposed MOU necessarily require the public officials involved to give, or offer or promise to give, their official votes "in consideration for" other official votes on the "same or another question" within the meaning of the statute?
Where, as here, we are called upon to interpret the meaning or coverage of a statute, our primary task is to determine the Legislature's intent.[7] In doing so, we "look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose."[8] Of course, we "interpret a statute in context, examining legislation on *Page 6 
the same subject, to determine the Legislature's probable intent."[9]
When the words of a statute can lead to differing interpretations, it is appropriate to consider the potential consequences that will flow from a particular interpretation.[10] We presume that the Legislature did not intend its enactment to result in absurd consequences, so when confronted with statutory text that is susceptible of two constructions, we will choose the one that renders the statute "reasonable, fair and harmonious with its intended purpose," and not one that would produce absurd results.[11] Finally, when a statute defining a crime or punishment is susceptible of different, but reasonable, interpretations, the interpretation more favorable to the defendant should ordinarily prevail.[12]
Although it has been urged that the text of section 86 might reasonably be read as forbidding any mutual commitment to take official action, even one that is arrived at as a result of an intergovernmental agreement such as the proposed MOU, we reject such a broad interpretation as contrary to both the statute's text and the apparent legislative intent. Turning first to the text of section 86, we observe that the statute is quite clearly aimed at regulating — and potentially criminalizing — the conduct of individual members of the state Legislature or local legislative bodies. We may reasonably infer from this focus on individual officials that the statute is not so much concerned with the substance of actions taken by the governing bodies as a whole, but with ensuring that the official decision to take a particular action is not tainted by the exertion of illegal influence, whether by bribe or promised vote-swap, on one or more of the individual decision-makers.
In addition, while the statute's bribery prohibition bars an official from asking for, receiving, or agreeing to receive a bribe that he or she understands is meant to influence his or her "official vote, opinion, judgment, or action," the statute's vote-trading prohibition is not so broadly worded; it is more narrowly focused on an official who gives, or offers or promises to give, any "official vote" in exchange or consideration for that of another official "upon the same or another question." In other words, section 86's ban on vote-trading limits itself to the actual or attempted trading of votes and, unlike the statute's prohibition on bribery, makes no reference to the potential effect that the improper conduct may have on official "opinion, judgment, or action" that may occur apart from an actual vote. In the *Page 7 
present circumstances, we believe that the relevant "official vote" is the one that would lead to the adoption of the proposed MOU in the first instance, and that the statute's vote-swapping prohibition would have no application to any subsequent official actions taken under that agreement after the decision to enter into it has been voted upon.
And as to that official vote — on whether the cities should agree to implement the county-favored conservation plan in exchange for the county's agreement to implement the development standards that the cities favor in the relevant city spheres, and vice-versa — the mere fact that the item voted upon involves a proposed trade-off betweenjurisdictions does not dictate or even imply that any trade-off will occur between officials voting on that item. As stated above, we have no basis to conclude (in the absence of any indication to the contrary) that any of the public officials involved will condition his or her vote on whether to adopt the proposed MOU on any other official's vote on this or another question. Thus, we presume that the members of each jurisdiction's legislative body will make an independent judgment as to whether the compromises embodied in the proposed MOU are beneficial to his or her local agency and constituents.
We believe that an illegal vote swap under section 86 would look quite different. As we have previously noted, the criminal offense of bribery connotes a corrupt attempt to influence official action for one's own benefit or advantage.[13] It is well established that "[t]he various bribery statutes are to be read in conjunction with this requirement"[14]
and that a specific intent to commit the crime of bribery is an essential element of the charge.[15] With this understanding, we believe that any fair reading of section 86 — which equates the conduct of vote-swapping to that of receiving or agreeing to receive a bribe and exposes those who commit either act to a term of incarceration in the state prison and, under section 88, a lifetime ban on holding any political office in the state[16] — must presume that the *Page 8 
commission of either offense requires a specific and corrupt intent to influence.[17]
Thus, for example, if (contrary to the assumptions we are making in this opinion) one or more of the involved city council members or county supervisors were to condition his or her vote on whether to enter the particular jurisdiction into the proposed MOU upon the receipt of some monetary or other advantage, he or she would be guilty of receiving or offering to receive a bribe. Similarly, if such an official were to condition this vote on some other official voting one way or another on the "same or another question," this would evince an intent to gain an advantage, arrived at via the exertion of influence upon the vote of another official, that would corrupt the transparency and legitimacy of both votes. In either hypothetical, the official(s) in question would exhibit a corrupt intent to influence the vote of another (and/or be influenced in casting his or her vote) based upon the prospect of personal gain or advantage, rather than upon an objective and unbiased evaluation of the matter being voted upon.
We discern no such corrupt intent from the mere existence of the mutual obligations set forth in the proposed MOU or the fact that the officials involved are called upon to determine whether entering into such an agreement is in the best interest of their jurisdictions and constituencies. To conclude otherwise would, in effect, criminalize the conduct of entering into intergovernmental contracts which, by their very nature, mutually commit participating jurisdictions to any number of obligations, and thereby subject the public officials who vote to enter into such agreements to the severe criminal and civil sanctions reserved for bribery and like offenses. We decline to attribute such sweeping coverage to section 86. Absurd results would follow. Public officials whose only goal was to negotiate an agreement in the interest of their jurisdictions would risk incarceration in the state prison and a lifetime ban from office. In our view, the Legislature could not have intended such a result. If it had, we posit, it would have expressed such an intent in much clearer language than that found in section 86. We therefore conclude that, while section 86 would prohibit any illegal exchange of votes between public officials with regard to the adoption of the proposed MOU, the agreement between jurisdictions embodied in the proposed MOU does not, in itself, amount to an illegal exchange of votes within the meaning of that statute.
2. Continuing Effect of Proposed Agreements With reference to the fact that the membership of the board of supervisors and city *Page 9 
councils will inevitably change over time, it has been suggested that the MOU and its associated implementing agreement would not continue in effect as to the participating jurisdictions as the compositions of their legislative bodies change. We disagree. Both a county board of supervisors and a city council are continuing bodies whose authority and obligations do not change simply because their memberships change over time.[18] Furthermore, a contract that "`appears to have been fair, just, and reasonable at the time of its execution, and prompted by the necessities of the situation or in its nature advantageous to the municipality at the time it was entered into, is neither void nor voidable merely because some of its executory features may extend beyond the terms of office of the members'" of the legislative body that entered into the contract.[19]
That said, however, it is established that a local legislative body's constitutionally delegated governmental power, [20] also called its "police power,"[21] includes the authority to regulate land use within its own jurisdiction, and that such a body may not contract away its own police power or that of any "successor legislative bodies."[22] A contract that purports to do so is invalid and unenforceable as contrary to public policy.[23] Thus, for example, one jurisdiction may not lawfully agree to give another jurisdiction "veto power" over a present *Page 10 
or future decision to amend its general plan.[24] Nor may a local government effect a promise not to enforce any zoning laws it might enact in the future against a particular development, [25] or not to enforce or enact rent control laws that would be enforceable against certain property owners.[26]
Here, however, the MOU would not call on the participating agencies to cede their authority to regulate land use within their jurisdictions, nor would participating agencies give veto power over such essential functions to another agency. Further, the MOU would not purport to bind all signatories in perpetuity. It is presumed that parties entering into contracts of this sort do so in contemplation of a jurisdiction's continuing right to exercise its police power in the future, even if that means the jurisdiction may effect a change in policy that leads it to terminate or withdraw from the contractual arrangement.[27] A contract must be interpreted, if possible, so as to make it "lawful, operative, definite, reasonable, and capable of being carried into effect,"[28] so we will not read into the proposed MOU a constitutional infirmity that does not plainly appear.[29]
Finally, the implementing agreement addressing the conservation plan that the cities would agree to adopt, as currently drafted, expressly provides that any participating jurisdiction may withdraw from the conservation plan and its associated permitting and fee-collection scheme by giving sufficient notice of its intent to do so.[30] Thus, given our *Page 11 
understanding of the circumstances, we do not discern any unconstitutional cession of police power.
Therefore, in response to the second question, we conclude that the proposed MOU and implementing agreement would continue in effect even as the memberships of the legislative bodies of the county and signatory cities change over time, provided that those agreements do not purport to surrender the "police power" of any of the participating local jurisdictions.
[1] Government Code section 56076 describes a local agency's "sphere of influence" as "a plan for [its] probable physical boundaries and service area," as determined by the county's local agency formation commission.See Alameda County Land Use Assn. v. City of Hayward,38 Cal. App. 4th 1716, 1719-1720 (1995); City of Agoura Hills v.Local Agency Formation Com., 198 Cal. App. 3d 480, 483 (1988);84 Ops.Cal.Atty.Gen. 66, 67 (2001). As a general matter and in the present circumstances, city spheres of influence encompass unincorporated county land that may eventually be annexed by the city and included within its jurisdictional limits.
[2] We will assume for purposes of this opinion that the county and cities will be able to determine among themselves which set of land use development standards is "more strict" than the other.
[3] All further references to the Penal Code are by section number only. The full text of section 86 reads as follows:
 Every Member of either house of the Legislature, or any member of the legislative body of a city, county, city and county, school district, or other special district, who asks, receives, or agrees to receive, any bribe, upon any understanding that his or her official vote, opinion, judgment, or action shall be influenced thereby, or shall give, in any particular manner, or upon any particular side of any question or matter upon which he or she may be required to act in his or her official capacity, or gives, or offers or promises to give, any official vote in consideration that another Member of the Legislature, or another member of the legislative body of a city, county, city and county, school district, or other special district shall give this vote either upon the same or another question, is punishable by imprisonment in the state prison for two, three, or four years and, in cases in which no bribe has been actually received, by a restitution fine of not less than two thousand dollars ($2,000) or not more than ten thousand dollars ($10,000) or, in cases in which a bribe was actually received, by a restitution fine of at least the actual amount of the bribe received or two thousand dollars ($2,000), whichever is greater, or any larger amount of not more than double the amount of any bribe received or ten thousand dollars ($10,000), whichever is greater. [¶] In imposing a fine under this section, the court shall consider the defendant's ability to pay the fine.
[4] § 7(6).
[5] § 7(3).
[6] County supervisors and city council members who are found to have received or offered or agreed to receive a bribe as defined above may be found criminally liable under not only section 86 but section 165 as well. See People v. Diedrich, 31 Cal. 3d 263, 272-274 (1982). The latter statute provides:
 Every person who gives or offers a bribe to any member of any common council, board of supervisors, or board of trustees of any county, city and county, city, or public corporation, with intent to corruptly influence such member in his action on any matter or subject pending before, or which is afterward to be considered by, the body of which he is a member, and every member of any of the bodies mentioned in this section who receives, or offers or agrees to receive any bribe upon any understanding that his official vote, opinion, judgment, or action shall be influenced thereby, or shall be given in any particular manner or upon any particular side of any question or matter, upon which he may be required to act in his official capacity, is punishable by imprisonment in the state prison for two, three or four years, and upon conviction thereof shall, in addition to said punishment, forfeit his office, and forever be disfranchised and disqualified from holding any public office or trust.
See also § 68 (bribes solicited or accepted by state or local executive or ministerial officers).
[7] Freedom Newspapers, Inc. v. Orange County Employees RetirementSystem, 6 Cal. 4th 821, 826 (1993).
[8] Dyna-Med, Inc. v. Fair Employment Housing Com., 43 Cal. 3d 1379,1386-1387 (1987).
[9] California Teachers Association v. Governing Bd. of Rialto UnifiedSchool Dist., 14 Cal. 4th 627, 642 (1997).
[10] Dyna-Med. Inc., 43 Cal.3d at 1387.
[11] Harris v. Capital Growth Investors XIV, 52 Cal. 3d 1142, 1165-1167
(1991).
[12] See People v. Canty, 32 Cal. 4th 1266, 1277 (2004).
[13] § 7(3), (6).
[14] People v. Gliksman, 78 Cal. App. 3d 343, 351 (1978).
[15] People v. Meacham, 256 Cal. App. 2d 735, 744 (1967).
[16] Section 88 specifies as follows:
Every Member of the Legislature, and every member of a legislative body of a city, county, city and county, school district, or other special district convicted of any crime defined in this title, in addition to the punishment prescribed, forfeits his or her office and is forever disqualified from holding any office in this state or a political subdivision thereof.
[17] See Oppenheimer v. Clifton's Brookdale, 98 Cal. App. 2d 403, 404
(1950) [criminally punishable offenses include "[b]ribery or attempted bribery or any attempt corruptly to influence official action"].
[18] Denio v. City of Huntington Beach, 22 Cal. 2d 580, 590 (1943),overruled on other grounds, Fracasse v. Brent, 6 Cal. 3d 784, 788-789,792 (1972); see also Cope v. County of Sutter, 206 Cal. 445, 454 (1929);King City Union High School Dist. v. Waibel, 2 Cal. App. 2d 65, 68
(1934).
[19] Santa Margarita Area Residents Together v. San Luis Obispo Co.,84 Cal. App. 4th 221, 232 (2000) (quoting Denio, 22 Cal. 2d at 590).
[20] Cal. Const. art. XI, § 7.
[21] Candid Enterprises, Inc. v. Grossmont Union High School Dist.,39 Cal. 3d 878, 885 (1985); Birkenfeld v. City of Berkeley, 17 Cal. 3d 129,140 (1976).
[22] Alameda County Land Use Assn., 38 Cal. App. 4th at 1725; seealso Avco Community Developers, Inc. v. South Coast Regional Commn., 17 Cal. 3d 785, 800 (1976); Mott v. Cline, 200 Cal. 434, 446 (1927); 108Holdings, Ltd. v. City of Rohnert Park, 136 Cal. App. 4th 186, 194-195
(2006); Santa Margarita Area Residents Together,84 Cal. App. 4th at 232-233.
[23] Avco Community Developers, Inc., 17 Cal. 3d at 800; Delucchi v.County of Santa Cruz, 179 Cal. App. 3d 814, 823 (1986).
[24] Alameda County Land Use Assn., 38 Cal. App. 4th at 1724-1725.
[25] Avco Community Developers, Inc., 17 Cal. 3d at 799-800; see alsoSanta Margarita Area Residents Together, 84 Cal. App. 4th at 232-233
(local jurisdiction may agree to temporarily "freeze" its zoning requirements during the limited period of time during which a development project is undergoing a required review and permitting process).
[26] See County Mobilehome Positive Action Committee, Inc. v. Countyof San Diego, 62 Cal. App. 4th 727, 735-738 (1998).
[27] Delucchi, 179 Cal. App. 3d at 823; Carty v. City of Ojai,77 Cal. App. 3d 329, 342 (1978).
[28] Civ. Code § 1643.
[29] See Delucchi, 179 Cal. App. 3d at 823.
[30] The implementing agreement would also provide that a withdrawing party remains responsible for completing any "existing and outstanding minimization and mitigation measures" required under the implementing agreement, the conservation plan, and/or its associated permitting scheme, for permits issued prior to the party's withdrawal. We do not view this provision as an infringement on any participating jurisdiction's future exercise of its police power because (1) it does not purport to apply to any exercise of police power that occurs after withdrawal and (2) as stated in the provision itself, federal law dictates the completion of any existing and outstanding minimization and mitigation measures that were required under the terms of a permitting scheme, habitat conservation plan, or implementing agreement of this nature. See 50 C.F.R. §§ 17.22(b)(7), 17.32(b)(7). *Page 1