[Crim. No. 13752.   Second Dist., Div. Two.   Mar. 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD
ARLEN CUSTER, Defendant and Appellant.

Richard S. Buckley, Public Defender, Wilbur F. Littlefield and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

236

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip Samovar, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered following a nonjury trial that resulted in his conviction of the crime of murder of the second degree. The victim of the homicide was Rhonda Jane Smith, the nine-year-old child of appellant's wife by a former marriage.

Appellant makes but one contention which he expresses as follows: ''Appellant was deprived of his constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 13 of the California Constitution in that appellant was denied due process of law and a full and fair trial in that appellant was insane at the time of the commission of the alleged crimes with which he was charged and thus incapable of committing crimes under section 26, subdivision 3 of the Penal Code of California.''

Since appellant does not challenge the sufficiency of the evidence to establish his guilt, apart from the issue as to his sanity, and the facts are not in dispute, we accept the summary thereof substantially as set forth in respondent's brief.

Clara Jane Custer lived with appellant and her two children, Rhonda Smith and Randy Smith, on October 27, 1965. On that date appellant gagged his wife, Clara Custer, and tied her to the bed. Appellant then went into the hall. Clara Custer heard what sounded like a slap and sheets ripping.

At about 5:30 a.m., Clara Custer untied herself. During the period she was tied up appellant came in and stuffed cotton up each side of her nose. Appellant then got dressed and left. After Clara Custer untied herself she went next door and summoned the police. The police arrived shortly after Clara Custer called them.

Officer Rankin went into the Custer house and observed a female Caucasian juvenile, later determined to be the body of Rhonda Jane Smith, on her back in the northeast corner of the bedroom. An autopsy revealed the cause of death as asphyxia due to impaction of a foreign body, a sponge, in the pharynx.

Officer Surwillo testified that on October 28, 1965, at about 8:30 a.m., he had a conversation with appellant. Appellant's statements to the officer included the following: that he had tied up both his wife, Clara Custer, and the child, Rhonda Jane Smith; that he had put pieces of polyethelene foam in

their mouths to keep them from screaming; that he wanted to gag them and tie them up so he could get away; that he was trying to get to the Coast Guard in Alameda County to turn over some samples of poison to prove that his wife was involved in Communistic activities.

Appellant further told Officer Surwillo that when Rhonda Jane Smith ''woke up'' while he was cutting cloth to tie her up, he hit her; that when he started to gag her with a piece of polyethelene foam, she bit him; that after he had succeeded in stopping her from screaming and struggling, he tied her up.

Following appellant's arraignment on November 30, 1965, at which time pleas of not guilty and not guilty by reason of insanity were entered, two psychiatrists were appointed to examine appellant. Both filed reports expressing their opinion that appellant had been insane at the time the offense was committed and was then sufficiently insane to be unable to cooperate in the conduct of his defense.

On January 18, 1966, it was stipulated that the court might consider these reports in connection with the hearing required by section 1368 of the Penal Code whenever a doubt as to a defendant's sanity arises during the pendency of a criminal action. Based thereon the court concluded that appellant was then insane within the meaning of sections 1367 and 1368 of the Penal Code. Further proceedings were suspended and appellant was committed to the Atascadero State Hospital until such time as he should be restored to sanity.

On February 3, 1967, the court received from the superintendent of the hospital a certification of sanity under section 1372 of the Penal Code and ordered appellant returned for further proceedings. On March 2, 1967, two additional psychiatrists were appointed pursuant to section 1027 of the Penal Code. One of these doctors reported that in his opinion appellant was insane at the time of the commission of the crime with which he was charged and at the time of his examination by the doctor but that he was able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner.

The second doctor expressed no opinion as to appellant's sanity at the time the crime was committed but concluded that he was then sane and able to cooperate with counsel and understand the nature of the proceedings against him.

A fifth report from a psychiatrist retained by appellant was

offered and received in evidence. This doctor concluded not only that appellant was able to participate in his own defense but that he was non-psychotic and did not need either "medical institutionalization" or "out-patient formal psychotherapy." He expressed no opinion as to his mental condition at the time of the commission of the acts in issue.

On March 29, 1967, the cause was submitted to the trial court on the basis of the transcript of the preliminary hearing and the medical reports of the several doctors. Following the court's determination of appellant's guilt, the instant appeal was filed which, as indicated, challenges only the propriety of the court's finding on the issue of sanity.

Both appellant and respondent acknowledge that on the narrow issue presented, the rules set forth in *People* v. *Wolff*, 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], are controlling. ██ The court in *Wolff* reaffirmed California's acceptance of the M'Naughton test which it held to be accurately stated in the following instruction given to the jury therein : " 'Insanity, as the word is used in these instructions, means a diseased and deranged condition of mind which renders a person incapable of knowing *or understanding* the nature and quality of his act, *or* to distinguish right from wrong in relation to that act.

" 'The test of sanity is this : First, did the defendant have sufficient mental capacity to know *and understand* what he was doing, and second, did he know *and understand* that it was wrong *and a violation of the rights of another?* To be sane and thus responsible to the law for the act committed, the defendant must be able to know *and understand* the nature and quality of his act *and* to distinguish between right and wrong at the time of the commission of the offense.' " (Italics added by the Supreme Court.)

██ In support of his contention that the trial court's determination of sanity in the instant action was unsupported and erroneous, appellant stresses the fact that three out of the five psychiatrists were of the opinion that appellant was insane at the time of the commission of the offense in question and that no expert or lay witness had testified to the contrary. However, in *Wolff* all of the four psychiatrists who testified were of the opinion that the defendant therein was insane. Nevertheless, the court stated at page 804 :

"However impressive this seeming unanimity of expert opinion may at first appear . . . our inquiry on this just as on other factual issues is necessarily limited at the appellate

level to a determination whether there is substantial evidence in the record to support the jury's verdict of sanity . . . under the law of this state. [Citations.]"

Appellant also argues that there was no substantial evidence apart from the doctor's reports upon which the trier of the fact could base a determination of sanity. Once again the specific language of the court in *Wolff* is apposite in the instant case (pages 805-806) : "[I]t is settled that 'the conduct and declarations of the defendant occurring within a reasonable time before or after the commission of the alleged act are admissible in proof of his mental condition at the time of the offense.' [Citations.] In the present case such evidence was introduced, both of defendant's conduct and of his declarations.

"*Conduct of Defendant as Evidence of Legal Sanity.* Among the kinds of conduct of a defendant which our courts have held to constitute evidence of legal sanity are the following: 'an ability on the part of the accused to devise and execute a deliberate plan' [citation] ; 'the manner in which the crime was conceived, planned and executed' [citation] ; the fact that witnesses 'observed no change in his manner and that he appeared to be normal' [citation] ; the fact that 'the defendant walked steadily and calmly, spoke clearly and coherently and appeared to be fully conscious of what he was doing' [citation] ; and the fact that shortly after committing the crime the defendant 'was cooperative and not abusive or combative' [citation], that 'questions put to him . . . were answered by him quickly and promptly' [citation], and that 'he appeared rational, spoke coherently, was oriented as to time, place and those persons who were present' [citation]."

As noted by the trial judge in the instant case, appellant's conduct and his statements to the police following his arrest indicate that his acts were planned and that he well understood that they were wrong. As in *Wolff*, appellant prepared in advance for his lethal acts by obtaining the instrumentalities he intended to use and manifested his awareness that what he intended to do was wrong by concealing them and lying about their presence when they were observed. As reported by Officer Surwillo of the Lynwood Police Department, appellant described his conduct on the night in question as follows:

"And he stated that he had planned this thing while the wife, the daughter, and the son were at a Girl Scout meeting, that he had cut some sheets and bed clothing in strips so he

could tie .them, and he hid them under the wife's bed. .When the wife returned, they had started to go to bed, and the toilet had overflowed creating water on the floor. And that he and the wife had got up out of bed and started to clean up the mess, and the water got to the ties under the bed, and she spotted them and asked what they were.

"And he stated he didn't know what they were. He said at this time he tried to hit her, but she wouldn't turn around, so he sent her to the kitchen to get something for him. When she returned, he then hit her, knocking her down, but not unconscious. He then jumped on her and gagged her, and then tied her arm and—one arm and one leg to the bed. He then could find no more ties, and started to walk outside to get a rope off the tether pole. He returned, she tried to get up then, but he returned and pushed the phone farther away from the bed. He then returned and tied her up securely, went into the little girl's room, Rhonda, and took a razor blade and started to make ties out of her bed—I believe he called it a bed sheet.

"She woke up while he was cutting the cloth, and so he hit her. He then tried to gag her with this piece of polyethelene foam, and she bit him. He then was successful in stopping her from screaming and struggling, and then tied her up.

"He went into the little boy's room and woke up the little boy and asked if he wanted to go on a train trip with him. The little boy stated no, he'd go when his sister and mother went.

"He then stated, 'If I took the little boy with me, I would be guilty of kidnapping, so I let him roll over and go back to sleep.' "

Lastly, appellant argues that certain comments of the trial court at the time it orally announced its verdict on both appellant's pleas of not guilty and not guilty by reason of insanity demonstrate that the court either was unaware of section 522 of the Evidence Code effective January 1, 1967, or was refusing to comply with its terms insofar as they might be said to have changed existing law.[1] We cannot agree with this contention.

Section 522 provides: ''The party claiming that any person, including himself, is or was insane has the burden of proof on that issue." The Law Revision Commission Comment thereto

---

[1] "THE COURT: Well, I have given this matter considerable amount of thought, and I am inclined to agree with you in part and disagree with

states: "Section 522 codifies an allocation of the burden of proof that is frequently referred to in the cases as a presumption. See, e.g., *People* v. *Daugherty,* 40 Cal.2d 876, 899, 256 P.2d 911, 925-926 (1953)." Similarly, the Comment—Assembly Committee on Judiciary to Evidence Code, section 607, dealing with the effect of certain presumptions in a criminal action states:

"Section 607 does not apply to the 'presumption' of sanity. Under the Evidence Code, the burden of proof on the issue of sanity is allocated by Section 522, and there is no 'presumption' of sanity. See Evidence Code § 522 and the Comment thereto. Hence, notwithstanding the provisions of Section 607, a defendant who pleads insanity has the burden of proving by a preponderance of the evidence that he was insane."

Initially it may be noted that the criticized statement of the trial court was made at the time it was announcing its decision on the issues raised by both of appellant's pleas. Insofar as it may have been directed to the determination of appellant's plea of not guilty, it was entirely correct both before and after the effective date of Evidence Code section 522. Section 1026 of the Penal Code has long provided, and still provides: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and *in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed.*" (Italics added.)

Of course, realistically viewed, it is readily apparent that by section 1026, the Legislature has provided that insanity shall not be an issue on the first phase of the bifurcated trials resulting from a defendant's dual pleas of not guilty and not guilty by reason of insanity. (Cf. *People* v. *Nicolaus,* 65 Cal.2d 866, 881 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Wells,* 33 Cal.2d 330, 351 [202 P.2d 53].) However, it chose to express itself in terms of a "conclusive presumption" and to the extent that the trial court used

you in part, Mr. Littlefield. I'm persuaded that it lacks certain elements in order to make it first degree murder. I am quite satisfied it meets the requirements of second degree murder. There was a felonious assault, well calculated to be dangerous to life, and it had been planned. And all the preceding events show that the defendant knew exactly what he was doing. The reason he was doing it, having to do with his mental state, is something else. But the defendant is not presumed to be insane; he's presumed to be sane. The facts surrounding the matter persuade me that he is guilty of second degree murder and that he is legally sane within the meaning of the M'Naghten rule, and that will be the finding."

similar language directed to the issue of guilt alone, it clearly was not erroneous.

■ However, even if we were to assume that the court's observations were directed to the second phase of the trial upon appellant's plea of not guilty by reason of insanity, there is no indication that by use of the word "presumed," it was placing any greater burden of proof upon appellant than that presently imposed by section 522. As pointed out by the commission's comment to section 522, the law concerning the required quantum of proof and its burden is essentially the same under new section 522 as it was under the previous law enunciated in *People v. Daugherty,* 40 Cal.2d 876, 900-901 [256 P.2d 911].

Any doubt that remains on this issue is removed by the fact that section 522 and its terminology were expressly called to the trial court's attention at the time of appellant's motion for a new trial. The trial court's statement in reply thereto[2] demonstrates that it, as the exclusive trier of fact, has previously concluded, and still concluded, that appellant had failed to sustain his burden of proof on his claim of insanity.

■ Although appellant has not advanced the contention, it has been suggested that the evidence so conclusively proves appellant's diminished mental capacity and his lack of "the capacity for malice required for murder" that we should reduce the crime from second degree murder to manslaughter. We feel compelled to reject this suggestion for the reason, as stated by the Supreme Court in *People v. Wolff, supra,* 61 Cal.2d 795, 804, that "our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the [trial court's judgment]." There is every reason to presume that the trial judge reached his decision in this case with full knowledge of the applicable law relating to the issue of sanity as it had been enunciated in *People v. Wolff, supra,* and also the law relating to the issue of diminished mental capacity as enunciated in the decision of *People v. Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d

---

[2]"The Court: Well, it may be that the doctors come to that conclusion, but it doesn't eliminate the facts which show a thinking and calculating mind, in my opinion. Now maybe the higher courts will take a dim view of my observations. This I don't know. But the acts that the defendant did prior to the killing of that child by asphyxiation, the preparation for the tying of them up so that they couldn't get away, and the muffling of their cries, shows he knew exactly what he was doing. And he knew, in my opinion, that if he got caught doing it, he could be punished for it."

911], filed approximately one year prior to the trial of the instant case.

Hence, the judgment of the trial court necessarily implies its finding, not only that the defendant was sane within the applicable legal definition of that term, but also that he had the mental capacity to entertain the malice requisite to the crime of murder. We conclude that all of the reasoning of the decision in *People* v. *Wolff, supra,* 61 Cal.2d 795, with respect to the sufficiency of the evidence to support the jury's verdict in that case applies with equal force to the findings of the trial court in the case at bench.

Since there "is substantial evidence from which the [trial court] could infer that the defendant was legally sane at the time of the offense such a finding must be sustained in the face of any conflicting evidence, expert or otherwise, for the question of weighing that evidence and resolving that conflict 'is a question of fact for the [trier of the facts'] determination.' " (*People* v. *Wolff, supra,* 61 Cal.2d 795, 804; *People* v. *Steele,* 254 Cal.App.2d 758 [62 Cal.Rptr. 452].)

The judgment is affirmed.

Roth, P. J., concurred.

FLEMING, J.—In my view this is a case of murder where the element of malice aforethought has not been proved.

While I agree with the finding of the trial court on the issue of legal sanity, I think the evidence unequivocally discloses that defendant by reason of severe mental illness lacked the capacity for malice required for murder. (Pen. Code, § 187) On four different occasions before the killing he had been a patient in mental hospitals under treatment for schizophrenia, and immediately after the killing he underwent a year's treatment in Atascadero State Hospital for insane delusions. Although defendant has refused to argue the issue of diminished capacity, we have an independent responsibility in the matter, and I would reduce the judgment of conviction from second degree murder to manslaughter, i.e. a voluntary killing without malice by reason of defendant's diminished capacity to entertain malice. (Pen. Code, § 192; *People* v. *Conley,* 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911].)

Appellant's petition for a hearing by the Supreme Court was denied May 15, 1968. Peters, J., was of the opinion that the petition should be granted.